## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| **Jane Doe** <br>        *Plaintiff*, <br><br> v. <br><br> **University of Maryland Medical System Corporation,** <br>  <u>Serve</u>: <br>  Adil A. Daudi <br>  250 West Pratt Street, 24th Floor <br>  Baltimore, MD 21201 <br><br> **Baltimore Washington Medical Center, Inc.,** <br>  <u>Serve</u>: <br>  University of Maryland Medical <br>  System  Corporation <br>  Office of the General Counsel <br>  250 West Pratt St., 24th Floor <br>  Baltimore, MD 21201 <br><br> **Kathleen McCollum,** <br>  <u>Serve</u>: <br>  University of Maryland Medical <br>  System  Corporation <br>  Office of the General Counsel <br>  250 West Pratt St., 24th Floor <br>  Baltimore, MD 21201 <br><br> **Thomas J. Cummings, Jr. M.D.,** <br>  <u>Serve</u>: <br>  3060 16th Street, N.W., Apt. #303 <br>  Washington, D.C. 20009 <br><br>       *Defendants.* | <br><br><br><br><br><br><br><br> **CASE NO.:** _____ |

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff Jane Doe hereby sues the Defendants, the University of Maryland Medical System,

Corp. ("UMMS") and  the  Baltimore  Washington  Medical  Center  ("BWMC")  for  unlawful

discrimination against her in violation of the Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C § 18116(a), Title II of the Americans with Disabilities Act, 42 U.S.C § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794 (collectively "the Disability Anti-Discrimination Laws").  Plaintiff brings this action pursuant to 42 U.S.C § 1983 because her rights are secured by these laws of the United States and because the discrimination alleged herein was committed by the Defendants acting under color of state law.  In support of her causes of action, Plaintiff alleges as follows:

## <u>INTRODUCTION</u>

Jane Doe, a college graduate in her early thirties, suffers from Hashimoto's Thyroiditis, Turner's Syndrome, and Non-Celiac Gluten Sensitivity, which causes severe changes in Jane Doe's mental status upon ingesting any amount of gluten.  For Jane Doe, ingesting gluten leads to episodes of psychosis during which she displays behaviors consistent with schizophrenia, delusional disorder, and bi-polar disorder.  Jane Doe's condition has on more than one occasion led to emergent treatment and Jane Doe's extended hospitalization for mental illness. Under the Disability Anti-Discrimination Laws, Jane Doe is a qualified individual with a disability.

On March 23, 2023, Jane Doe accidentally ingested gluten and became psychotic to the point she had to be escorted by police to the hospital for emergency treatment.  Jane Doe arrived at BWMC's emergency room at 6:23 P.M. where she was held for observation until March 30, 2023. Jane Doe was thereafter involuntarily committed to the psychiatric department at BWMC where she was held against her will for nearly three months.  This action arises from the discrimination and unlawful treatment Jane Doe experienced both in the emergency department and while being held in the locked psychiatry ward during her involuntary commitment to BWMC all in violation of the Disability Anti-Discrimination Laws.

## THE PARTIES

1.      Plaintiff Jane Doe is an adult person and citizen of the United States who resides in Maryland.

2.      Defendant UMMS is a "nonprofit, nonstock corporation" in the State of Maryland. Md. Code Ann. Educ. § 13-302(7).  UMMS was created by statute.  *See id.* § 13-301 *et seq*.  All of the voting members of its Board of Directors are appointed by the Governor of Maryland.  *Id.* § 13-304(b).  According to its authorizing statute, UMMS is intended to "serve the highest public interest" and its purposes "are essential to the public health and welfare" of the State.  *Id.* § 13-302(4).  UMMS's was created by the Maryland Legislature to "provide medical care of the type unique to University medical facilities for the citizens of the State and region, …" *Id.* § 13-302(1).  To accomplish its purpose, UMMS owns and operates a medical system comprised of hospitals and other member organizations.  UMMS's offices are located at 250 W. Pratt St., Baltimore, Maryland  21201.  UMMS accepts federal funds and is a state actor and "governmental entity, that is, an arm or instrumentality of government for purposes of Plaintiff's assertion of . . . individual constitutional rights."  *See Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 584 (D. Md. 2021); *accord Napata v. Univ. of Md. Med. Sys. Corp.*, 417 Md. 724, 737, 12 A.3d 144, 151 (2011); *see also Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995) ("We hold  that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment.").

3.      Defendant BWMC is a corporation organized under the laws of the State of Maryland, with its principal place of business located at 301 Hospital Drive, Glen Burnie,  Maryland

21061.  BWMC is a wholly owned subsidiary of UMMS and also accepts federal funds and is thus a state actor.  *See Hammons v. Univ. of Md. Med. Sys. Corp.*, 2023 U.S. Dist. LEXIS 2896, 2023 WL 121741 (D. Md. Jan. 6, 2023).  BWMC is one of the hospitals that form the medical system owned and operated by UMMS, and as such, UMMS substantially controls BWMC's operations. The services provided to Jane Doe in this case were billed by UMMS, not BWMC.

4.      Defendant McCollum is a natural person who resides in Maryland and who  serves as the President and Chief Executive Officer of BWMC.  Upon information and belief, Ms. McCollum is an employee of BWMC.

5.      Defendant Cummings is a natural person who resides in Maryland and who is  a medical professional practicing at BWMC.  Upon information and belief, Dr. Cummings is an employee of BWMC.

## JURISDICTION AND VENUE

6.      This action is brought pursuant to 42 U.S.C. § 1983.

7.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) (civil rights jurisdiction), and supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a).

8.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, acts, and omissions giving rise to these claims occurred in this  District. All Defendants reside in this District, maintain places of business in this District, and/or  conduct business in this District.

## STATEMENT OF FACTS

**I.  Jane Doe's medical history and creation of the Advance Directive.**

9.      Since 2016, Dr. Phyllis Heffner has been Jane Doe's primary mental health provider.

Dr. Heffner was once a Medical Director at the Children's National Medical Center in Washington, D.C., and an Acting Medical Director at the Good Shepherd Center in Baltimore, Maryland.  Board Certified in General Psychiatry, Child and Adolescent  Psychiatry, and Integrative Pediatrics, Dr. Heffner has been honored by numerous awards, including an Albert Nelson Marquis 2020 Lifetime Achievement Award by *Marquis Who's Who* and 2020 Woman in Medicine Honoree by *America's Top Doctors*.

10.     In the years Dr. Heffner has been caring for Jane Doe, she diagnosed Jane Doe with Hashimoto's Thyroiditis and Non-Celiac Gluten Sensitivity, which causes severe changes in Jane Doe's mental status upon ingesting any amount of gluten.  During periods she remains gluten free, Jane Doe lives at home with her mother and enjoys the mental capacity to participate in the normal activities of life, including the ability to make her own healthcare decisions.

11.     Considering this diagnosis and her long history with Jane Doe, Dr. Heffner has recommended that Jane Doe avoid gluten completely and,  when necessary, be prescribed Risperidone, an antipsychotic medication primarily used to treat schizophrenia, at a low dosage of 0.5 mg per day with a maximum dose of 0.75 mg as an effective treatment during any periods of psychosis.

12.     Conversely, Dr. Heffner has advised against the use of higher dosages of antipsychotic medications because these often lead to extreme lethargy, akathisia, and extrapyramidal  symptoms, such as cogwheel rigidity and tongue fasciculations.  Furthermore, Dr. Heffner has advised against the use of Benzodiazepines, a class of depressants that produce sedation when ingested, because of the fear of addiction and the risk of disinhibition and the loss of memory.

13.     A substantial body of medical literature supports Dr. Heffner's conclusion that Jane Doe's episodes of psychosis relate to a severe gluten sensitivity.  Additionally, experience shows

that when Jane Doe abstains from ingesting gluten, she does not experience episodes of psychosis.

14.    Given these recommendations and out of concern for her treatment should she accidentally ingest gluten in the future and a psychotic episode occur, Jane Doe created and executed her Advance Directive and Appointment of Healthcare Agent on July 19, 2022 (the "Advanced Directive").  To do so, upon the advice of counsel, she used the Advance Directive form created by the Maryland Attorney General's Office that was available on their website at that time.

15.    The purpose of the Advance Directive was to ensure that any health-care decision and treatment for Jane Doe be in accord with her wishes and desires, and in the event she becomes unable to communicate her wishes and desires, the agent selected by Jane Doe is authorized make decisions for her and to act in good faith to proceed with Jane Doe's best interests in mind.

16.    Recognizing that her father, John Doe, has her best interests in mind and is well-versed in her medical history and responses to past treatment, Jane Doe selected her father as her health-care agent.

17.    In selecting her father as her agent, Jane Doe understood that her father would "review[] the benefits, burdens, [and] risks that might result from a given treatment or course of treatment, or from the withholding or withdrawal or course of treatment" and then act in her best interests when making appropriate health-care decisions and selecting treatments.

18.    The Advance Directive recognizes that, in the event Jane Doe's wishes cannot be ascertained from Jane Doe, her father is in the best position to recognize what her wishes are, and he is authorized to make decisions on her behalf.

19.    Importantly, the Advance Directive explicitly grants John Doe "the power and authority to approve [Jane Doe's] admission to or release from a psychiatric hospital or unit."

20.     The Maryland General Assembly passed the Health Care Decisions Act of 1993 to legalize Advance Directives, clarify and standardize how health care agents are chosen, when they are allowed to act, how they are discharged, the scope of their duties and the corresponding duties of healthcare providers.  Md. Health-Gen. Code Ann. Tit. 5, Subt. 6, Refs & Annos.

21.     Under Maryland's Health Care Decisions Act, "[a]ny competent individual may, at any time, make a written or electronic advance directive regarding the provision of health care to that individual, or the withholding or withdrawal of health care from that individual." Md. Code Ann. Health-Gen. § 5-602(a).

22.     In 2001, the General Assembly passed an additional statute, Health General § 5-602.1, creating a specific path for people to create Advance Directives covering mental health treatment.  That law provides that "an individual who is competent may make an Advance Directive [for] mental health services" which may include "[t]he designation of an agent to make mental health services decisions for the declarant." Md. Code Ann. Health-Gen. § 5-602.1.

23.     The Maryland legislature has sought to increase awareness and use of mental health advance directives by present or future recipients of mental health services.  *See* Md. Code Ann. Health-Gen. § 5-615.2.

24.     In Maryland, a medical and/or mental health care provider must abide by a patient's Advance Directive and treat a patient in accordance with the preferences set out in the Advance Directive or otherwise face possible criminal consequences. Md. Code Ann. Health-Gen. §§ 10-701(c)(9); 10-1003.

25.     Maryland law provides further that, "A health care provider that intends not to comply with an instruction of a health care agent or a surrogate shall: (1) inform the person giving the instruction that: (i) The health care provider declines to carry out the instruction; (ii) The person

7

may request a transfer to another health care provider; and (iii) The health care provider will make every reasonable effort to transfer the patient to another health care provider; and (2) Assist in the transfer."  Md. Code Ann. Health-Gen. § 5-613(a).

26.     Through the above statutory provisions, and others, Maryland has created an Advance Directive program (the "AD Program") to protect citizens' fundamental rights to bodily integrity that encompasses the doctrine of informed consent in the provision of healthcare and mental health services throughout the State.

27.     BWMC's own website recognizes that "An Advance Directive is a set of written instructions that allows you to make decisions about your future medical care, and/or to designate somebody to make those decisions for you if you are no longer able to do so," and that "an Advance Directive is the best way to make sure everyone knows what you want."[1]

**II.  Defendants' rejection of Jane Doe's Advance Directive.**

28.     On March 23, 2023, when Jane Doe arrived at BWMC's emergency room, John Doe immediately notified the Defendants about the Advance Directive and the need to confer with him in the event Jane Doe is unable to competently make any health-care decisions on her own behalf.

29.     The Defendants were already aware of the Advance Directive because of Jane Doe's prior admission to BWMC, which occurred from November 11, 2022, to December 12, 2022.

30.     Jane Doe's prior admission at BWMC in November 2022 was voluntary, was supported by her parents, and the hospital worked collaboratively with John Doe to resolve the psychotic episode.

31.     When Jane Doe returned to BWMC on March 23, 2023, Dr. Cummings remembered

---

[1]     *See*     https://www.umms.org/bwmc/patients-visitors/for-patients/advance-directive-molst     (last accessed December 3, 2023).

her and noted in his initial psychiatric assessment of Jane Doe upon her admission to the psychiatry department that Jane Doe had been "weaned off of recommended required antipsychotic medication by outpatient psychiatrist Dr. Heffner by report" following her prior admission.

32.    Dr. Cummings further noted in his psychiatric assessment:

> Per past and current reports patient with suppose[d] condition of gluten induced psychosis. Minimal scientific and clinical evidence to support this claim. Patient very much most likely with schizophrenia. Patient does have known and documented history of Turner syndrome with associated metabolic and hormonal conditions including affecting her thyroid.
>
> Writer called patient's father by telephone today with patient's expressed written consent. Charge RN Dottie present as well. Informed father that his form for 'Appointment of Healthcare Agent' and 'Advance Directive for Mental Health Treatment' is not valid under Maryland law.

33.    Dr. Cummings gave no explanation for rejecting Jane Doe's Advance Directive in March 2023, a document he did not reject during Jane Doe's prior voluntary admission in November 2022.  It appears from his psychiatric assessment notes that Dr. Cummings was unhappy with Jane Doe's and Dr. Heffner's decision to wean Jane Doe off the high dosages of antipsychotic medications Dr. Cummings had prescribed for her during her previous admission and which he recommended that she continue to take following her discharge from BWMC in December 2022. Dr. Cummings also recorded his disagreement with Dr. Heffner's conclusion that Jane Doe's episodes of psychosis are induced by gluten ingestion.  Dr. Cummings diagnosed Jane Doe with schizophrenia.

34.    Jane Doe's Advance Directive is valid under Maryland law.  *See* Md. Health Gen. Code §§ 5-602 and 5-602.1.  Dr. Cummings' assertion otherwise was incorrect.

35.    Despite their knowledge of the Advance Directive, its legal validity, and their acceptance of the Advance Directive just four months earlier, the Defendants consistently declined

to recognize the Advance Directive and the desires of Jane Doe and/or John Doe in contravention of the federal Patient Self-Determination Act, *See* 42 U.S.C. §§ 1395cc(f)(1), (2)(A), 1396a(w)(1), (2)(A); and Maryland law, including, but not limited to Md. Health Gen. Code §§ 5-602, 5-602.1, 5-605(a)(2), 5-613(a), and 10-701(c)(9).

36.     Indeed, Md. Health Gen. Code § 10-701(c)(9) mandated that the Defendants provide treatment "in accordance with the preferences in the Advance Directive."

37.     Taking matters into his own hands, Dr. Cummings refused to acknowledge the Advance Directive despite his view that Jane Doe was incompetent and suffering from Schizophrenia.

38.     The Defendants' refusal to acknowledge Jane Doe's Advance Directive and their refusal to treat Jane Doe in accordance with her Advance Directive, or in accordance with the instructions of her designated agent, John Doe, denied Jane Doe of her right to participate in and enjoy the benefits of the State's AD Program.   Other patients, both with and without a mental disability, were allowed to participate in the AD Program and the Defendants followed the advance directives or the decisions of designated agents in their provision of health care and/or mental health services to the other patients.   Defendants denied Jane Doe's right to participate in and enjoy the benefits of the State's AD Program, and otherwise discriminated against Jane Doe by reason of her mental disability.

### III. Defendants' unlawful seclusion of Jane Doe and the application of unlawful physical and chemical restraints.

39.     On at least five separate occasions while Jane Doe was being held for observation in the emergency department at BWMC, and continuing after her move to the psychiatry ward, Jane Doe was subjected to unlawful physical and chemical restraints in violation of Jane Doe's fundamental liberty interest in bodily integrity and freedom protected under the Fourteenth

Amendment of the United States Constitution and in violation of Maryland law.

40.     Under Maryland law, physical and/or chemical restraints may be used "only during an emergency in which the behavior of the individual places the individual or others at serious threat of violence or injury" and must be ordered by a physician in writing. Md. Health Gen. Code § 10-701(c)(3).

41.     Jane Doe was subjected on multiple occasions to being physically restrained and involuntarily injected with a cocktail of sedative drugs, referred to as a "B52" and consisting of haloperidol lactate, lorazepam, and diphenhydramine when there was no emergency and no "serious" threat of violence or injury.  On at least one occasion, Jane Doe was restrained with hard restraints on her wrists and ankles that effectively strapped her to her bed, where she remained for hours until she fell asleep, at which point the restraints were finally removed.

42.     In addition, Jane Doe was often subjected to unlawful seclusion both in the emergency department and in the psychiatric department.  Such seclusion involved locking Jane Doe alone in a room, prohibiting Jane Doe from receiving visitors, limiting, or preventing Jane Doe's communications with persons outside the hospital, preventing her parents from having any input  into Jane Doe's treatment, and preventing Jane Doe from meeting privately with anyone, including her attorneys.  Seclusions, like physical and/or chemical restraints, may be used "only during an emergency in which the behavior of the individual places the individual or others at serious threat of violence or injury" and must be ordered by a physician in writing. Md. Health Gen. Code § 10-701(c)(3)(seclusions); *see also* §§ 10-702 (communications) and 10-703 (visitors).

43.     Under the law, Jane Doe "shall be entitled to converse privately with and receive visits: . . . (3) During reasonable visiting hours that the facility sets, from *any visitor if the individual wishes to see the visitor*."  Md. Health Gen. Code § 10-703(a)(3) (emphasis added).  Only "for

medically justified reasons" may the facility restrict a visit or private conversation and only if the restriction is documented and made part of the patient's medical records. *Id.* § 10-703(c)(1).

44.     Jane Doe's nearly eight-day stay in the emergency department is particularly troubling since under Maryland law, the maximum length of time the Defendants could lawfully keep her in the emergency department under observation is "30 hours." Md. Health Gen. Code § 10-624(b)(5)("An emergency evaluee may not be kept at an emergency facility for more than 30 hours.").

45.     Defendants furthered Jane Doe's isolation and seclusion by prohibiting Jane Doe's parents from visiting her in the psychiatry ward, restricting their telephone communications, and by refusing to communicate critical information about Jane Doe's treatment plan to Jane Doe's parents, including what medications Defendants were administering to her.

46.     Additionally, because he placed zero weight on Dr. Heffner's diagnoses of Jane Doe, Dr. Cummings did not take the necessary steps to rule out these diagnoses and consider alternative less intrusive treatment plans for Jane Doe.

47.     Dr. Cummings refused to confer with Dr. Heffner to discuss Jane Doe's  medical history and appropriate treatment plan and refused to consult with Jane Doe's parents, even though John Doe was her duly authorized health care agent under her Advance Directive.

48.     Dr. Cummings' claim that the Advance Directive was legally deficient was simply a pretext by Dr. Cummings to avoid his legal duties to comply with a  patient's Advance Directive and to punish Jane Doe and her family for not following his recommendations after Jane Doe's prior hospitalization at BWMC.

49.     Through Dr. Cummings, the Defendants blatantly disregarded Jane Doe's rights under the law.  The use of unnecessary seclusions and unlawful restraints not only violated Jane

Doe's fundamental liberty interest in bodily integrity and freedom protected under the Fourteenth Amendment of the United States Constitution, but also it constitutes a form of discrimination under the Disability Anti-Discrimination Laws.

**IV.     The involuntary and unlawful commitment of Jane Doe.**

50.     In 1982 the General Assembly overhauled the State's psychiatric admission and commitment laws. Individuals may be admitted for treatment either involuntarily, pursuant to an ALJ's order after a hearing per Md. Health Gen. Code § 10-632, or voluntarily.

51.     At the outset of her initial appearance at the BWMC, Jane Doe (either through herself or her father) consistently requested *voluntary* admission into the BWMC. *See* Md. Health Gen. Code §§ 10-609, 10-610, and 10-611.

52.     In contravention of the Advance Directive, the Defendants ignored this request and immediately sought Jane Doe's involuntary admission by scheduling an April 11, 2023 hearing before the Maryland Office of Administrative Hearings ("OAH").  *See* Md. Health Gen. Code § 10-613 *et seq.* (Stat. Part III).

53.     The United States Supreme Court and the Fourth Circuit recognize a fundamental liberty interest in bodily integrity that is protected under the Fourteenth Amendment of the United States Constitution.  *See e.g., Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 269, 278 (1990)("This notion of bodily integrity [protected by the Fourteenth Amendment] has been embodied in the requirement that informed consent is generally required for medical treatment" and "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions."); *Ingraham v. Wright,* 430 U.S. 651, 673 (1977)(liberty interests protected under the Fourteenth Amendment include "those privileges long recognized at common law" and include the "right to be free from, and to obtain

judicial relief for, unjustified intrusions on personal security."); *Wash. v. Glucksberg,* 521 U.S. 702, 724 (1997)(right to bodily integrity encompasses the doctrine of informed consent recognized at common law); *Doe v. Rosa,* 795 F.3d 429, 436-37 (4th Cir. 2015)("Under established precedent, these constitutional rights include a Fourteenth Amendment substantive due process right against state actor conduct that deprives an individual of bodily integrity."); *Meeker v. Edmundson,* 415 F.3d 317, 321 n.2, 323 (4th Cir. 2005)(recognizing the right to bodily security protected by substantive due process); *see also Guertin v. Michigan,* 912 F.3d 907, 917-21 (6th Cir. 2019)(in-depth discussion of the right to bodily integrity arising under the Fourteenth Amendment).

54.     Civil commitment for any purpose constitutes such a serious deprivation of the fundamental right to liberty that, to meet due process guarantees, it requires the State to justify confinement by clear and convincing evidence. *Addington v. Texas*, 441 U.S. 418, 432-33 (1979).

55.     These standards are reflected in Maryland law.  Before Jane Doe could be involuntarily committed to BWMC, the Defendants were required to prove by clear and convincing evidence that *at the time of the hearing* each of the following elements then existed: (1) Jane Doe had a mental disorder; (2) Jane Doe needed inpatient care for treatment; (3) Jane Doe presented a danger to the life or safety of herself or others; (4) Jane Doe was *unable or unwilling to be admitted voluntarily*; and (5) there was no available, less restrictive form of intervention consistent with the welfare and safety of Jane Doe.  Md. Health Gen. Code §§ 10-617(a) and 10-632(e)(2)(emphasis added); *see also* COMAR 10.21.01.09(F).

56.      The hearing was held on April 11, 2023 and Dr. Cummings was the hospital's sole witness. Administrative Law Judge ("ALJ") Kristin Blumer, expressly "credit[ing] his testimony," ruled in favor of involuntary commitment to BWMC's psychiatry ward.  ALJ Blumer was persuaded by Dr. Cummings' testimony, which was in some material parts, perjurious.

57.     After first testifying that his objection to the Advance Directive "ha[d] to do with the document itself, not issues of [Jane Doe's] capacity," Dr. Cummings testified falsely that "[Jane Doe] has not stated to me her wishes to be a voluntary patient," even though he admitted that "[s]he ha[d] made reference to it."

58.     When asked why he was unwilling to abide by Jane Doe's father's request to voluntarily admit her under the Advance Directive, Dr. Cummings testified that he had "both legal and ethical concerns regarding [Jane Doe's] potential plan for voluntary treatment," and later clarified, "[m]y concern . . . is that there may be an element of coercion and the concern is that she's very, very impaired cognitively and being told what to say or do" by her father . . . "[a]nd I think it's very important with any medical legal decision which is the standard in the field for an adult to be making their own decisions free of any coercion both from providers or clinical staff as well as from families or others."

59.     Dr. Cummings' testimony confirms why Jane Doe's involuntary commitment was unlawful:  Jane Doe signed the Advance Directive for this very reason so that when she was found to be incompetent (which Dr. Cummings cannot dispute), her decision-making authority then vested with her father, whom Jane Doe had designated as her healthcare agent because her father was someone who knew her wishes and would have her best interests in mind, including the authority to approve Jane Doe's admission to or release from a psychiatric hospital or unit, such as the BWMC.

60.     ALJ Blumer demonstrated her lack of understanding of Maryland law when she stated on the record the following about the Advance Directive:

> The document that she and her family has signed is also not persuasive to me. The document, I saw it. It was signed last year. There has been an admission, a discharge, a decompensation and an admission this year with this hospital. Second admission to this hospital. So I am not persuaded by this document. The hospital is required to evaluate the patient based on her presentation during this

15

hospitalization. The document may have value. The document may be legally important for many reasons but I don't find that the hospital, no body has argued to me that the hospital is bound by that.

61.     As explained *supra,* the Advance Directive was legally binding on the hospital. Dr. Cummings's unsupported opinion that John Doe was coercing his daughter by "telling her what to do" had  no bearing on whether the Defendants were lawfully bound to abide by the Advance Directive. It was not Dr. Cummings's prerogative to make that determination, especially after he acknowledged Jane Doe's capacity to make the Advance Directive.

62.     Throughout this testimony, Dr. Cummings consistently contradicted himself and his own legal counsel and the medical records demonstrate his testimony further conflicts with other personnel at the BWMC having interactions with Jane Doe.

63.     For instance, even though his own statements in Jane Doe's medical records reflect his awareness that Dr. Heffner was Jane Doe's current provider, writing that Jane Doe had been "weaned off of recommended required antipsychotic medication by outpatient psychiatrist Dr. Heffner by report," Dr. Cummings  testified under oath during the April 11, 2023 hearing that he was "not fully aware of who [Jane Doe's] most current treater would be."  In addition to his own records, Dr. Heffner is identified as Jane Doe's "PCP" (Primary Care Physician) throughout her medical records in the emergency department, which Dr. Cummings testified he reviewed.

64.     Dr. Cummings also testified, "The family has supplied letters of recommendations that are older in dating going back a number of years.  I do not know if anyone is currently treating her."  The family supplied letters referenced by Dr. Cummings in his testimony are from Dr. Heffner and are dated May 5, 2021 and June 16, 2022, *i.e.,* far from "going back a number of years."

65.     Dr. Cummings testified as such to sweep under the rug his unwillingness to confer with Dr. Heffner in assessing Jane Doe's diagnosis and considering less intrusive means to treat Jane

Doe. When Dr. Cummings finally recollected Dr. Heffner's name during his testimony, it became clear why he refuses to coordinate with her and Jane Doe's family: he blames them for Jane Doe's current disposition and gives no weight to the diagnoses of Hashimoto's Thyroiditis and Non-Celiac Gluten Sensitivity despite the qualifications of Dr. Heffner and the substantial medical literature supporting Dr. Heffner's conclusions.

66.     Dr. Cummings was also willing to fabricate evidence to demonstrate there was no available, less restrictive form of intervention consistent with the welfare and safety of Jane Doe. To rule out Jane Doe's release to her family home, Dr. Cummings testified that Jane Doe presented to the hospital with the "exact hair tie" she was wearing from the last admission several months prior:

> Sure, just reiterating one of the most striking features, I'll try to be brief, of the re-admission despite her leaving with a care plan had been, had, in our medical assessment, zero improvement at all in any hygiene, self-grooming, self-care, despite living with a loved one, to the point where to this day, the same hair tie from the last admission is embedded, deeply matted in her hair.

67.     Dr. Cummings of course was in no position to have observed Jane Doe, or the countless times Jane Doe's mother fixed her hair with hair ties between admissions at BWMC. Dr. Cummings testimony regarding Jane Doe's hair tie is nothing more than a conjecture.

68.     Jane Doe's involuntary confinement in BWMC's psychology ward, severely limiting her exposure to the outside community and restricting even visitation from her parents, constitutes a form of discrimination based on disability prohibited by the Disability Anti-Discrimination laws. *See Olmstead v. L.C. by Zimring,* 527 U.S. 581 (1999).

## V. Attempts to forcibly inject Jane Doe with long-lasting high dosages of antipsychotic drugs without her consent or the consent of her lawfully appointed health care agent.

69.     After receiving ALJ Blumer's order to involuntarily admit Jane Doe, UMMS, the

BWMC, and Dr. Cummings quickly scheduled a clinic review panel under Md. Health Gen. Code §
10-708 and obtained a panel order to forcibly inject Jane Doe with long-lasting higher dosages of
antipsychotic medications.

70.     Jane Doe immediately appealed the panel's order and eventually a hearing  before an
ALJ was scheduled for April 25, 2023.

71.     Amid preparation for the April 25th hearing, Jane Doe notified the  Defendants of the
witnesses she intended to present, including, but not limited to, Dr. Heffner and Dr. Erik Messamore,
who interviewed Jane Doe as described *infra*.  The Defendants had been aware of these witnesses
since at least April 21, 2023,  if not longer.

72.     On April 21, 2023, the Defendants' counsel voluntarily withdrew their request for
forcible   injections (thereby cancelling the April 25th hearing) because "since the initial [clinical
review  panel], the patient has been taking medications."   While the news was welcomed, it was also
disturbing because at no point had Jane Doe ever refused her medications to justify the initial panel
review in the first place.

73.     More  troubling, even though Jane Doe continued to ingest her medications and
progress significantly, Dr. Cummings attempted to inject her on April 24, 2023, and for several days
thereafter on April 25 and April 26, and each  time, Jane Doe refused.

74.     Undeterred by Jane Doe's refusal and despite her compliance to ingest her
medications, Dr. Cummings immediately re-scheduled another clinical review panel even though not
a week had passed since he had agreed to withdraw his original panel request and even though Jane
Doe "has a significant constitutional liberty interest to be free from the *arbitrary* administration of
antipsychotic drugs." *Mercer v. Thomas B. Finan Ctr.*, 476 Md. 652, 265 A.3d  1044, 1064, 1074
(2021) (emphasis in original; citation and internal quotation omitted).

75.     On April 26, 2023, Dr. Cummings notified Jane Doe that a panel would  convene the next day on April 27th at 3:45 p.m. to consider his request for the forcible injections. As soon as Jane Doe's counsel became aware of this, they immediately provided notice to Defendants' counsel of Jane Doe's witnesses—Dr.  Heffner, Dr. Richard Ratner ("Dr. Ratner"), Dr. Messamore, and Jane Doe's father—on  April 26, 2023 at 7:25 pm EST.

76.     Not once did the Defendants consider the April 21st notice that Jane Doe  had witnesses who were available to testify on her behalf, nor did they even consider accommodating their availability, instead resorting to an accelerated process at the arbitrary behest of Dr. Cummings.

77.     Given the exigent circumstances and because Defendants' counsel never  responded to Jane Doe's request for witnesses until 11:51 a.m. EST (not even four hours  before the scheduled panel hearing), Jane Doe's attorney attempted to contact Jane Doe's  statutorily mandated lay advisor to coordinate the presentation of Jane Doe's witnesses. Under Md. Health Gen. Code § 10-708(e)(2), Jane Doe was entitled to "present  information, including witnesses" and to "request assistance from a lay advisor."

78.     As defined by law, the "lay advisor" is "an individual at a BWMC, who is knowledgeable about mental health practice and who assists individuals with rights complaints."  *Id.* at § 10-708(a)(2).  Before the panel can even reach a decision, it must "[r]eceive information presented by" Jane Doe, including her witnesses.  *Id.* at §§ 10-708(f)(3)(iii), (h)(1). The panel, by law, must also "[a]ssist [Jane Doe] and the treating physician to arrive at a mutually agreeable treatment plan," "[r]eview[] the potential consequences of requiring the administration of medication," and "may not approve the administration of medication where alternative treatments are available and are acceptable to both the individual and the BWMC personnel who are directly responsible for implementing [Jane Doe's]  treatment plan." Md. Health Gen. Code §§ 10-708(f)(2),

19

(f)(3), (h)(3).

79.     Indeed, instead of permitting Jane Doe to coordinate the presentation of her witnesses, the Defendants obstructed this right through their attorney, Mr. Mohink, who, on April 27, 2023 (the day of the panel) at 11:51 a.m. EST, argued that Jane Doe has no "right to  produce any witnesses other than her civil advocate."

80.     While Mr. Mohink reconsidered his position that same day at 1:25 p.m. EST, the damage was already done, with only two hours remaining until the panel.  Jane Doe did not have an adequate opportunity to notify her witnesses in time and, in fact, only two of her four witnesses were available for the medical panel at 3:45 p.m. EST.  Both witnesses were also limited to ten minutes each.

81.     This coordination was made even more difficult by the fact that Mr. Mohink obstructed Jane Doe's counsel's ability to speak directly with Jane Doe's statutorily required lay advisor on the basis that the lay advisor was an employee of BWMC and was therefore represented by counsel.  The lay advisor, however, is an individual who is supposed to represent Jane Doe and would therefore be acting in her interests in advance of, during, and after the panel.  Therefore, because Jane Doe's interests were adverse to the BWMC's, by right the lay advisor should and must have been independent. *Washington v. Harper*, 494 U.S. 210, 236 (1990).

82.     The Fourth Circuit has already admonished a lay advisor under similar circumstances for his "minimal participation during the administrative proceeding" and because his "participation at the hearing was limited."  *U.S. v. Morgan*, 193 F.3d 252, 266 (4th Cir. 1999).  This is precisely what happened to Jane Doe: she was assigned a lay advisor who did not have her best interests in mind and who minimally participated, if at all, at the clinical review panel.

83.     Eventually, the panel affirmed Dr. Cummings's renewed request for forcible

injection.  By making this decision, the panel concluded that Jane Doe objected to the medication even though she did not.  *See* Md. Health Gen. Code §§ 10-708(a)(4), 10-708(b).

84.     Under the relevant statutory scheme, "medication" is defined simply as the "psychiatric medication prescribed for the treatment of a mental disorder."  *Id.* § 10-708(a)(3). Significantly, that definition does not distinguish between the mechanisms by which a patient absorbs the medication. For weeks, Jane Doe had ingested the pill form of the medication that the  BWMC and Dr. Cummings sought to inject by force.  Thus, she had not refused the medication;  rather, she objected to the method of administration, *i.e.*, forcible injection against her will.

85.     Ironically, in deciding whether "other reasonable alternative treatments" had  been considered, the panel recognized that Jane Doe "has been stabilizing (getting better) on  oral paliperidone."  Despite Jane Doe's cooperation and stabilization, astonishingly the panel agreed that the forcible injection of the *same* medication was required.

**VI.     Administrative Law Judge erroneously affirms panel finding.**

86.      On April 27, 2023, Jane Doe appealed the panel's finding, triggering her right  to an appeal before an ALJ. Throughout the course of the May 2, 2023 hearing before ALJ Daniel Andrews,  Dr. Cummings engaged in self-serving testimony that was contradictory, off base, and out of  touch with the realities of Jane Doe's confinement.

87.     Dr. Cummings continued to testify that Jane Doe presented as a danger to herself and others, yet when ALJ Andrews inquired whether Jane Doe had engaged in any dangerous behavior within the past week, the only incident that Dr. Cummings could recall was an incident over two weeks prior on April 16th, when Jane Doe allegedly verbally threatened a staff member.  How a verbal threat is tantamount to a dangerousness finding to support a forcible   injection is

constitutionally incomprehensible.

88.     Then, in reliance on mere speculation, Dr. Cummings justified his request on the basis that Jane Doe may not continue orally ingesting her medications post-admission even though she had cooperated for several weeks and even though she submitted testimony that she would abide by the instructions of her psychiatrist upon discharge.

89.     Dr. Cummings's rationale was without any basis: the injections that Dr. Cummings sought to use apparently last for thirty (30) days, and so presumably he would equally have to rely on Jane Doe's willingness to return every thirty (30) days for the injections administered by Dr. Cummings. Yet, by his logic, because he believes she might become unwilling to orally ingest her medications post-discharge, then surely he must believe that she would be unwilling to return for forcible injections. And clearly, it cannot be the case that Dr. Cummings would be allowed to indefinitely detain Jane Doe for the sole purpose of injecting her every thirty (30) days.

90.     Generalities such as Dr. Cummings's are not sufficient under the law. *See United States v. Bush*, 585 F.3d 806, 816 (4th Cir. 2009). Given that the Maryland legislature has made it crystal clear that forcible injection should be the last resort, *see Martin v. Dep't of Health & Mental Hygiene,* 114 Md. App. 520, 528, 691 A.2d 252, 256, *certiorari granted,* 346 Md. 242, 695 A.2d 1230, *vacated as moot,* 348 Md. 243, 703 A.2d 166 (1997), Dr. Cummings's justifications should have failed to pass muster. *U.S. v. Watson*, 793 F.3d 416, 419 (4th Cir. 2015)("Forcible medication is not justified every time an incompetent defendant refuses treatment; on the contrary, 'those instances may be rare.'")(quoting *Sell v. United States*, 539 U.S. 166, 180 (2003)).

91.     Forcible medication is "a tool that must not be casually deployed," and courts must be vigilant to ensure that such orders, which "carry an unsavory pedigree," do not become "routine."

*United States v. Chatmon*, 718 F.3d 369, 373–74 (4th Cir. 2013). At any rate, it was not a permissible overriding interest to rely on a patient's length of stay as the basis for a forcible injection. *See, e.g.*, *Allmond v. Dep't of Health & Mental Hygiene*, 448 Md. 592, 618-19 (2016)(holding that an "interest in shortening the length of an individual's in-patient care . . . does not constitute an overriding justification . . . for the purpose of medicating an individual against the individual's will when the individual is not being held as a result of a criminal conviction.").

92.     The paradoxical testimony continued:  Dr. Cummings then justified his request  for forcible injections on the basis that Jane Doe was unwilling to shower, as if hygiene should be the basis to forcibly inject a patient. Not surprisingly, the testimony was false: as the nurse's notes in Jane Doe's medical records revealed, Jane Doe had recently showered, but Dr. Cummings danced around the issue by stating (without any personal knowledge) that the nurse's note must be present only because Jane Doe asked the nurse for a shower.

93.     The medical records are clear: "Patient had her laundry done as requested, and  also showered this shift," as noted by Nurse Jessica Dobbs on April 30, 2023.  This myopic reading of the medical records is consistently borne out by Dr. Cummings's testimony, just as he previously testified during the April 11th hearing before ALJ Blumer that, despite what the medical records say, he had no knowledge of who Jane Doe's current provider was.

94.     And yet despite these inconsistencies and insufficient testimony, ALJ Andrews found this testimony to be satisfactory and ruled in favor of the BWMC by holding that, by the preponderance of the evidence, the BWMC complied with the statutory mechanisms.

95.     Disturbingly, recorded on the record but outside the hearing of the participants in the proceedings, ALJ Andrews engaged in deliberations with other unidentified ALJs.  During this

recorded conversation: (a) ALJ Andrews explicitly rejects "the way [Dr. Cummings] reviewed the record," which he found not to be persuasive; (b) ALJ Andrews blatantly calls into question the viability of forcible injections, which relies on Jane Doe agreeing to return to the BWMC ("Who knows if she'll ever come back for follow-up?"); (c) it was discussed that "the family might need to be committed as well" after Judge Andrews remarks that Jane Doe's family's views on Jane Doe's gluten sensitivity are "crazy;" and (d) the hospital is questioned "[w]hy are they pushing."[2]

96.     Even though ALJ Andrews, while deliberating with the unidentified ALJs, tilted against Dr. Cummings, finding his review of the record not to be persuasive and finding that it is not credible to suggest that Jane Doe will not be successful after discharge, all while an unidentified ALJ questioned "why [is the hospital] pushing," somehow ALJ Andrews found in favor of the BWMC. The personal comments among the ALJs deriding and disparaging Jane Doe's family, however— combined with ALJ Andrews's opinion of Dr. Cummings—create doubt that this was an impartial hearing.

### VII.    Dr. Messamore's evaluation and Jane Doe's status at least as of May 24, 2023.

97.     Even if Jane Doe's original commitment to BWMC's locked psychology ward was founded upon a constitutionally adequate basis and complied with Maryland law, involuntary commitment must be terminated when the basis originally justifying confinement no longer exists. *O'Connor v. Donaldson,* 422 U.S. 563, 574-75, 580 (1975)(citing *McNeil v. Director, Patuxent Institution,* 407 U.S. 245, 249-250 (1972) and *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)). "A finding of 'mental illness' alone cannot justify a State's locking a person up against [her] will and keeping [her] indefinitely in simple custodial confinement." *Id.* at 575.  Simply stated, "a State

---

[2] The audio recording containing these comments is available.

cannot constitutionally confine without more a non-dangerous individual who is capable of surviving safely in freedom by h[er]self or with the help of willing and responsible family members or friends." *Id.* at 576.

98.     Under Maryland's Release Statute, "an individual who has been admitted" involuntarily "shall be released from a facility . . . if the individual: (1) Does not have a mental disorder; or (2) Has a mental disorder but: (i) Does not need inpatient medical care or treatment to protect the individual or another; (ii) Would not endanger the individual or the person or property of another; and (iii) Would be cared for properly by the individual or by a responsible person who is able and willing to care for the individual." Md. Health Gen. Code § 10-806(b).  Maryland law authorizes "the Director or the administrative head of the facility" to direct the release of such a person, § 10-806(a), and requires the Director to do so upon finding that any individual is being held in custody contrary to law. Md. Health Gen. Code § 10-802.

99.     In April and in May 2023, John Doe called Defendant McCollum's office for assistance and to demand BWMC recognize the Advance Directive and release Jane Doe from custody.  Upon information and belief, McCollum was also contacted in April and May 2023 by MindFreedom International, a non-profit organization that advocates to protect the rights of individuals with psychiatric disabilities, regarding Jane Doe's unlawful confinement. Defendant McCollum, as the Chief Executive Officer of BWMC, owed Jane Doe a statutory duty to release Jane Doe upon finding that she was being held unlawfully at BWMC.

100.     In accordance with the nurses' observations stated in Jane Doe's medical records and confirmed by Dr. Messamore's video-recorded evaluation of Jane Doe on May 24, 2023,[3] Jane

---

[3] The video recording is available.

Doe by May 24, 2023 was unquestionably qualified for release from custody.

101.    Dr. Messamore is a psychiatric physician, pharmacologist, and university professor, and his specialties include the fields of psychopharmacology, complex mood disorders, psychosis, antipsychotic medication, and schizophrenia. He has served as an Associate Professor of Psychiatry at the Northeast Ohio Medical University ("NEOMED") in Rootstown, Ohio, and he is also the Medical Director of NEOMED's Best Practices in Schizophrenia Treatment Center.

102.    After evaluating Jane Doe on May 24, 2023 and analyzing the most-recent medical records available at the time between April 25, 2023 and May 23, 2023, Dr. Messamore reached the following conclusions in a written report: "(1) Jane Doe shows no evidence of psychosis at this time; (2) Jane Doe shows no evidence of danger to herself at this time; (3) Jane Doe shows no evidence of danger to others at this time; (4) Although she has some sort of underlying illness that causes her to experience episodes of psychosis and cognitive impairment, symptoms of that condition are currently present to only a minimal or moderate degree; and (5) Jane Doe does not require inpatient treatment."

103.    Dr. Messamore frames his review of Jane Doe's medical records by explaining the BWMC's "Violence Checklist" assessments, which evaluate whether a patient is confused; irritable, boisterous, verbally threatening; physically threatening; and attacking objects. Notably, Jane Doe was evaluated 27 times between April 25, 2023 and May 22, 2023, and based on the "Violence Checklist," the only positive findings reflected in Jane Doe's medical records were for "confusion" from one month before the evaluation on April 25 and 26.

104.    Next, Dr. Messamore summarizes four categories of findings based on the medical records: mental status, interest in self-care, willingness to take oral medication, and contrasting negative assessment. First, as to Jane Doe's mental status, Dr. Messamore highlights several

26

instances where the licensed clinical social worker Angela Egger ("Ms. Egger") noted that Jane Doe was continually improving.  As Ms. Egger writes on May 8, 2023, "Patient continues to show improvements in both mood and symptoms of psychosis."  That same note summarizes how Jane Doe "was seen interacting with some peers and  engaging in treatment."

105.    Significantly, as Ms. Egger states on May 1, 2023, Jane Doe "was able to hold a logical conversation" and expressed how she has "been able to write so much lately."  Similarly, Ms. Egger previously wrote on April 28, 2023 that Jane Doe "has  started journaling her ideas for different novels she would like to write [and . . .] was able to discuss some of her ideas and appeared to enjoy engaging in a conversation."  In fact, Jane Doe taught Ms. Egger how "to play a card game . . . in a logical fashion."

106.    Next, Dr. Messamore directs the reader to examples in the medical records where Jane Doe has expressed an interest in self-care.[4]   For instance, on May 18, 2023, Jane Doe "verbalized she was happy to be able to shower and enjoy herself more."  This  comports with Ms. Egger's note on May 1, 2023, where she draws attention to Jane Doe's  much-improved hygiene, noting that Jane Doe "had allowed staff to attempt to comb her hair . . . and also showed some interest in starting to clean herself."

107.    Further, Dr. Messamore's report identifies proof of Jane Doe's willingness to take oral medication.  In late April, Jane Doe "agreed that she feels better when she is on her psychiatric medications."  In fact, on May 1, Jane Doe "continue[d] to voice a desire to  remain on her medication orally."

---

[4] This is important because Dr. Cummings continuously cites Jane Doe's hygiene as a basis  to detain her.  For instance, Dr. Cummings testified, without proof, that a hair tie had been stuck in Jane Doe's hair for months.

108.    Finally, although there is a "striking discrepancy" between the nurses' notes and  Dr. Cummings's notes, Dr. Cummings's most recent note from May 12, 2023 stated that Jane Doe "does not report current suicidal thoughts" and "denies current violent or homicidal ideation thoughts."  Dr. Cummings also conceded that Jane Doe was in compliance with taking her medication, which was "generally good at this time."

109.    To assess Jane Doe's current mental status, Dr. Messamore opines on her  general attitude, appearance, and behavior; speech; affect; thought process and content; and cognition. He describes that Jane Doe's general attitude, appearance, and behavior was  "pleasant and cooperating throughout the assessment" even though the assessment was lengthy.  Dr. Messamore "pressed her for answers" and "challenged her firmly" and "touched painful memories from her past."  Despite these "various significant stressors, [Jane Doe] did not become irritable, withdrawn, or inappropriately reactive."

110.    Dr. Messamore opines that Jane Doe's speech latency, speech value, and rate  and prosody of her speech was normal.  Additionally, Jane Doe "had a restricted  range of affect."  Jane Doe's thought process was well organized and did not suggest a disordered thought process.  Dr. Messamore "attempted to elicit psychotic ideas by conducting a lengthy interview, including stress-provoking themes, and introducing topics that often elicit psychotic ideas."  Despite Dr. Messamore's attempts, "[a]t no point did Jane Doe show any evidence of delusional thinking or hallucinations." Accordingly, Jane Doe showed "no evidence of psychosis" during the interview.

111.    Dr. Messamore continues that Jane Doe did not express "thoughts suggestive  of danger to herself or others" and denied "thoughts of self-harm . . . and harming others."  Jane Doe looked forward to going home and planned to work on her novels and join a soccer  team.

112.    Finally, while her memory appeared to be impaired "in a rather complex way"  and

her concentration was "mild to moderately impaired," Dr. Messamore concludes that Jane Doe's ability to calculate is average, her fund of knowledge is average or better than average, and her abstract reasoning ability was good.  Notably, Jane Doe, over the course of this hour-long evaluation, was able to  "correctly multiply 2 x 64 in her head," correctly estimated that "it's about 3,000 miles from  Maryland to California," could "recite the names of the last 5 presidents" of the United States, "correctly interprets the familiar proverb 'even monkeys fall from trees,'" "could recall 5 of 5  words after a lengthy period of distraction," and "correctly knew the date."

113.     Dr. Messamore concludes his report with an analysis of whether Jane Doe  requires hospital care.  Upon consideration of the medical records and his May 24, 2023 assessment of Jane Doe, Dr. Messamore opines that "[Jane Doe's] illness does not fulfill criteria for inpatient care."   Dr. Messamore describes Jane Doe's current symptom status as mild.  Dr. Messamore reasons that the BWMC staff consistently described Jane Doe as a cooperative young woman who would like to go home, work on a novel, and get a pet.  Further, Dr.  Messamore did not "elicit any sign of psychosis, depression, mania, anxiety, or obsession."

114.     Jane Doe's status had improved so much that Dr. Messamore suspects that "most physicians would not admit her to a hospital" even on a voluntary basis and he further suspects that "most insurance companies would deny coverage for hospital care because there is  no evidence of suicidal thinking, no evidence of risk of self-harm, no evidence of danger to  others, and no evidence of inability to attend to basic needs."  This is especially so because Jane Doe has a "home she can return to, a parent to rely on for assistance, and an outpatient  psychiatrist to continue her care."  Indeed, "[b]ased on her current mental status, a person not aware of her past would probably not suspect her of having a mental illness."

115.     These findings are on all fours with the previous findings of Dr. Ratner, who is a

psychiatrist and forensic psychiatrist, who is currently a Clinical Professor of Psychiatry and Behavioral Sciences at the George Washington University School of Medicine and a Distinguished Life Fellow of the American Psychiatric Association, with nearly 50 years of practice and who was previously the President of the Washington, DC, Psychiatry Society and the American Society for Adolescent Psychiatry.

116.     Dr. Ratner personally observed Jane Doe on April 21, 2023 and May 1, 2023 and similarly concluded that there was no longer a basis to hold Jane Doe against her will, as of those dates. As of May 1, Jane Doe "no longer appeared actively psychotic." She was not "unruly, uncooperative nor unresponsive, and responded appropriately to the questions" Dr. Ratner had asked. When asked whether there was any basis for maintaining Jane Doe on involuntary status at the time of his interviews, Dr. Ratner stated: "The answer is an unequivocal 'no.' She is voluntarily cooperating with her treatment program and seems competent to make treatment decisions for herself at this time."

117.     Jane Doe's continuation of involuntary confinement in BWMC's psychology ward after she qualified for release and keeping her exposure to the outside community limited and restricting even visitation from her parents, constitutes a form of discrimination based on disability prohibited by the Disability Anti-Discrimination laws. *See Olmstead v. L.C. by Zimring,* 527 U.S. 581 (1999).

**VIII.    The Defendants use Jane Doe's unlawful confinement and the specter of involuntary injections of antipsychotic drugs as leverage to coerce Jane Doe into giving up many of her Constitutional rights in exchange for her release.**

118.     Upon information and belief, most patients admitted to BWMC's psychiatric ward who become eligible for release are, in fact, released. The only apparent medical justification to keep Jane Doe in custody for longer was the Defendants' purported fear that she would again stop taking

the antipsychotic medications Dr. Cummings wanted her to take after discharge. The Defendants continued to keep Jane Doe in custody for at least two months despite her improvements and eligibility for release while they pursued Dr. Cummings' desire to force involuntary injections. The Defendants did have a substantial financial incentive to continue Jane Doe's confinement— UMMS, received more than $176,000 from her private insurance company.

119.     In response to her unlawfully continued confinement, several lawsuits were filed against the Defendants. On April 20, 2023, John Doe sued the BWMC and UMMS to require them to recognize Jane Doe's Advance Medical Directive and John Doe's appointment as Jane Doe's lawfully designated healthcare agent in *John Doe v. Baltimore Washington Med. Ctr., et al.,* Case No. C-02-CV-23-000764 (Cir. Ct. A.A. County 2023).

120.     On May 3, 2023, Jane Doe filed a petition for judicial review of the ALJ's decision authorizing the Hospital Defendants to involuntarily inject Jane Doe with psychiatric medications pursuant to Md. Health Gen. Code § 10-708 in *In re Jane Doe,* Case No. C-02-CV-23-000902 (Cir. Ct. A.A. County 2023). On May 5, 2023, Jane Doe filed a petition for writ of habeas corpus to remedy her unlawful detention in *Jane Doe v. Baltimore Washington Med. Ctr., et al.,* Case No. C-02-CV-23-000910 (Cir. Ct. A.A. County 2023). On June 6, 2023 Jane Doe filed an emergency motion for judicial release in *Jane Doe v. Baltimore Washington Med. Ctr., et al.,* Case No. C-02-CV-23-001066 (Cir. Ct. A.A. County 2023). Finally, on June 9, 2023, Jane Doe brought an action in the United States District Court for the District of Maryland seeking damages for violations of her constitutional rights guaranteed by the Fourteenth Amendment of the U.S. Constitution and Article 24 of the Maryland Declaration of Rights in *Jane Doe v. University of Maryland Med. Sys. Corp., et. al.,* 1:23-cv-10572 (D. Md. 2023).

121.     Despite all these lawsuits, the Defendants steadfastly refused to release Jane Doe

until her attorneys and the Defendants negotiated a "Consent Order" entered in the underlying habeas case on June 12, 2023.  The conditions to which Jane Doe was forced to agree to obtain her freedom in the "Consent Order" are discriminatory and patently unconstitutional: Jane Doe **was required to**: (1) replace her long-term treating psychiatrist, Dr. Heffner, with another psychiatrist; (2) "continue to take the Invega (paliperidone) 6 mg in pill form daily that was prescribed while in the hospital," (3) use the services of Family Intervention Partners ("FIP") at least once every three months; (4) allow FIP and its providers to act as one of her mental health providers; (5) "instruct her [new] treating psychiatrist to consult with FIP regarding her treatment regime, including . . . prescribed medication;" (6) "follow all recommendations of her [new] treating psychiatrist regarding her treatment and medications/prescriptions;" (7) "accept referral to" and "follow" all "recommendations" made by "the Anne Arundel County Crisis Intervention Team;" (8) "take all prescribed medications that concern her psychiatric health;" and (9) "dismiss, with prejudice, all pending actions against [the Defendants]."

122.    The Defendants' continuation of custody of Jane Doe for months after inpatient care was no longer needed or required, and the Defendants' refusal to release Jane Doe from custody unless she agreed to waive her fundamental rights to bodily integrity, to choose her own physicians, and to exercise informed consent for medical treatment, and to dismiss her pending lawsuits constitute forms of discrimination against Jane Doe in violation of the Disability Anti-Discrimination Laws.

123.    The United States Supreme Court and the Fourth Circuit have both recognized that the antipsychotic drugs prescribed for Jane Doe by Dr. Cummings during her involuntary admission "can have serious, even fatal, side effects."  *Washington v. Harper,* 494 U.S. 210, 229 (1990); *United States v. Watson,* 793 F.3d 416, 419 (4th Cir. 2015).  Known side effects include "dystonia, a severe

involuntary spasm of the upper body, tongue, throat, or eyes, . . . akasthesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction); and tardive dyskinesia, . . . a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face." *Harper,* 494 U.S. at 230.  Jane Doe has experienced some of the side effects described in *Harper,* namely dystonia and akasthesia.

124.    The mere existence of the Consent Order, which called for the release of Jane Doe in exchange for her dismissal of lawsuits and agreement to follow a particular regime of medical care dictated by the Defendants, including continuation of the above described medications, demonstrates Dr. Cummings and the other Defendants did not truly believe Jane Doe was psychotic or a danger to herself or others, or in need of inpatient care, yet they continued to hold her in custody without legal justification.

125.    Since her release, Jane Doe and her parents have challenged the legality of the Consent Order in *J.M. et al. v. University of Maryland Medical Sys. Corp. et al.,* Case No. 1:23-cv-1684 (D. Md. 2023).  This action does not assert any claims previously asserted in any of the prior lawsuits described herein and dismissed pursuant to the Consent Order.

**COUNT I**
[Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C § 18116(a)]
Jane Doe v. BWMC and UMMS

126.    Plaintiff incorporates paragraphs 1 through 125 as if restated herein verbatim.

127.    Section 1557 of the PPACA, 42 U.S.C § 18116(a), provides that, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. [§] 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance..."

128.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, provides in turn that, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . ."

129.    Jane Doe was at all relevant times a "qualified individual with a disability."

130.    BWMC and UMMS, who each receive Federal financial assistance, knowingly, intentionally, and with actual malice excluded Jane Doe from participation in, and denied her the benefits of the AD Program as described herein.

131.    Further, BWMC and UMMS, acting in concert with one another, knowingly, intentionally, and with actual malice discriminated against Jane Doe on account of her disability by, among other things: (1) using unlawful physical and chemical restraints against her; (2) keeping her in seclusion and isolated from the community and her parents without justification; (3) rejecting her legally valid Advance Directive; (4) seeking involuntary commitment in disregard of her Advance Directive and providing false and misleading testimony against her to obtain her involuntary commitment; (5) regardless of whether Jane Doe's involuntary commitment was legally justified, by continuing to keep Jane Doe in custody long after any reasonable justification ceased to exist; (6) by failing to provide Jane Doe with the necessary training and education needed to avoid further confinement, and (7) by conditioning her freedom upon her agreement to give up fundamental constitutional rights, including her right to bodily integrity which encompasses the doctrine of informed consent and to choose her healthcare providers, and her right to petition the government for redress of her grievances.

132.    Each of the foregoing acts of discrimination and Jane Doe's exclusion from the AD Program also violated Jane Doe's rights protected under the First, Fourth, Fifth and/or Fourteenth

Amendments to the U.S. Constitution and was committed under color of state law.

**COUNT II**
[Title II of the Americans with Disabilities Act, 42 U.S.C § 12132]
Jane Doe v. BWMC and UMMS

133.    Plaintiff incorporates paragraphs 1 through 125 as if restated herein verbatim.

134.    Under Title II of the ADA, 42 U.S.C § 12132, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

135.    Jane Doe was at all relevant times a "qualified individual with a disability."

136.    BWMC and UMMS, who each receive Federal financial assistance and are public entities, knowingly, intentionally, and with actual malice excluded Jane Doe from participation in, and denied her the benefits of the AD Program as described herein.

137.    Further, BWMC and UMMS, acting in concert with one another, knowingly, intentionally, and with actual malice discriminated against Jane Doe on account of her disability by, among other things: (1) using unlawful physical and chemical restraints against her; (2) keeping her in seclusion and isolated from the community and her parents without justification; (3) rejecting her legally valid Advance Directive; (4) seeking involuntary commitment in disregard of her Advance Directive and providing false and misleading testimony against her to obtain her involuntary commitment; (5) regardless of whether Jane Doe's involuntary commitment was legally justified, by continuing to keep Jane Doe in custody long after any reasonable justification ceased to exist; (6) by failing to provide Jane Doe with the necessary training and education needed to avoid further confinement, and (7) by conditioning her freedom upon her agreement to give up fundamental constitutional rights, including her right to bodily integrity which encompasses the doctrine of

informed consent and to choose her healthcare providers, and her right to petition the government for redress of her grievances.

138.    Each of the foregoing acts of discrimination and Jane Doe's exclusion from the AD Program also violated Jane Doe's rights protected under the First, Fourth, Fifth and/or Fourteenth Amendments to the U.S. Constitution and was committed under color of state law.

**COUNT III**
[504 of the Rehabilitation Act of 1973, 29 U.S.C § 794a]
Jane Doe v. BWMC and UMMS

139.     Plaintiff incorporates paragraphs 1 through 125 as if restated herein verbatim.

140.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, provides that, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . ."

141.    Jane Doe was at all relevant times a "qualified individual with a disability."

142.    BWMC and UMMS, who each receive Federal financial assistance, knowingly, intentionally, and with actual malice excluded Jane Doe from participation in, and denied her the benefits of the AD Program as described herein.

143.    Further, BWMC and UMMS, acting in concert with one another, knowingly, intentionally, and with actual malice discriminated against Jane Doe on account of her disability by, among other things: (1) using unlawful physical and chemical restraints against her; (2) keeping her in seclusion and isolated from the community and her parents without justification; (3) rejecting her legally valid Advance Directive; (4) seeking involuntary commitment in disregard of her Advance Directive and providing false and misleading testimony against her to obtain her involuntary commitment; (5) regardless of whether Jane Doe's involuntary commitment was legally justified,

36

by continuing to keep Jane Doe in custody long after any reasonable justification ceased to exist; (6) by failing to provide Jane Doe with the necessary training and education needed to avoid further confinement, and (7) by conditioning her freedom upon her agreement to give up fundamental constitutional rights, including her right to bodily integrity which encompasses the doctrine of informed consent and to choose her healthcare providers, and her right to petition the government for redress of her grievances.

144.     Each of the foregoing acts of discrimination and Jane Doe's exclusion from the AD Program also violated Jane Doe's rights protected under the First, Fourth, Fifth and/or Fourteenth Amendments to the U.S. Constitution and was committed under color of state law.

**COUNT IV**
[Battery]
Jane Doe v. BWMC and UMMS

145.     Plaintiff incorporates paragraphs 1 through 125 as if restated herein verbatim.

146.     A battery occurs when there is intentional, nonconsensual touching of the body of another that is harmful or offensive to the person who was touched.

147.     As alleged herein, the Defendants, acting through their employees and agents, on multiple occasions, and without adequate de-escalation, used unlawful physical restraints (including 4-point shackles) and chemical restraints (involuntary "B52" injections) against Jane Doe.

148.     Jane Doe did not consent to any of these uses of physical and/or chemical restraints.

149.     Each use of physical and/or chemical restraints caused harm to Jane Doe, who was both traumatized, terrorized, and forced to receive sedative medications against her will.

150.     Each use of physical and/or chemical restraints was offensive to Jane Doe.

151.     Each use of physical and/or chemical restraints was unlawful and unjustified under Maryland law, primarily Md. Code Ann. Health-Gen. § 10-701(c)(3).

152.     Defendants are responsible for the actions of their employees and agents committed within the scope of their normal duties, as was the case when each battery was committed.

**COUNT V**
[False Imprisonment]
Jane Doe v. All Defendants

153.     Plaintiff incorporates paragraphs 1 through 125 as if restated herein verbatim.

154.     As alleged herein, all the Defendants, acting in concert together, caused Jane Doe to be held in custody of the BWMC's psychiatric ward against her will for months after it was evident and obvious that any reasonable justification that may have once supported her involuntary commitment had ceased to exist.

155.     As directors and/or responsible officials of BWMC and/or BWMC's psychiatric ward, Defendants McCollum and Cummings, had a statutory duty imposed by Md. Code Ann. Health-Gen. §§ 10-802 and 10-806  to release or cause the release of Jane Doe from custody when there no longer arguably existed any legal justification to keep her in custody.

156.     Defendants, with knowledge of Jane Doe's unlawful confinement, intentionally and with actual malice refused to release Jane Doe from their custody for months when Jane Doe was fully eligible for release and no legitimate basis remained to keep Jane Doe locked up in the psychiatry ward at BWMC.

**REQUEST FOR JURY TRIAL**

157.     Plaintiff respectfully requests trial by jury as permitted by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgement against the Defendants, independently, and jointly and severally as may be permitted by law, for recovery of compensatory damages against the Defendants in amounts to be determined at trial; punitive damages against Dr. Cummings, BWMC,

and UMMS; attorney's fees and costs pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. 54; and such other relief that this Honorable Court deems to be just and proper.

Dated: December 6, 2023                              Respectfully Submitted,


/s/Ray M. Shepard_____
Ray M. Shepard, Federal Bar No. 09473
The Shepard Law Firm, LLC
122 Riviera Drive
Pasadena, Maryland 21122
Phone: 410-255-0700
Facsimile: 443-773-1922
Email: Ray@Shepard.Law

*Counsel for Plaintiff Jane Doe*