IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JANE DOE,

        *Plaintiff*,

    v.                                     Civil No.: 1:23-cv-03318-JRR

UNIVERSITY OF MARYLAND
MEDICAL SYSTEM CORPORATION,
*et al.*,

        *Defendants*.

## MEMORANDUM OPINION

Plaintiff Jane Doe brings this action against Defendants University of Maryland Medical System Corporation ("UMMS"), Baltimore Washington Medical Center, Inc. ("BWMC"), Kathleen McCollum, and Thomas J. Cummings, Jr.  (ECF No. 1; the "Complaint.")  Pending before the court is Defendants' Motion to Dismiss.  (ECF No. 14; the "Motion.")  The court has reviewed all papers; no hearing is necessary.  Local Rule 105.6 (D. Md. 2023).  For the reasons that follow, by accompanying order, the Motion will be granted.

I.      **BACKGROUND**[1]

This action arises from alleged "discrimination and unlawful treatment [Doe] experienced both in the emergency department and while being held in a locked psychiatry ward during her involuntary commitment to BWMC."  (ECF No. 1 at p. 2.)

A.  **Factual Background**

Doe is a person with a disability who "suffers from Hashimoto's Thyroiditis, Turner's Syndrome, and Non-Celiac Gluten Sensitivity."  (ECF No. 1 at p. 1.)  Dr. Phyllis Heffner, Doe's

---

[1] For purposes of resolving the pending Motion, the court accepts as true all well-pled facts set forth in the Complaint. (ECF No. 1.)  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

primary mental health provider, diagnosed her with Hashimoto's Thyroiditis and Non-Celiac Gluten Sensitivity.  *Id.* ¶ 10.  Doe experiences episodes of psychosis "upon ingesting any amount of gluten" due to her Non-Celiac Gluten Sensitivity.  *Id.*  Doe's behaviors during these episodes are "consistent with schizophrenia, delusional disorder, and bi-polar disorder."  *Id.*  Dr. Heffner prescribed Doe a low dosage of an antipsychotic medication used primarily to treat schizophrenia for "any periods of psychosis."  *Id.* ¶ 11.  Dr. Heffner "advised [Doe] against the use of higher dosages of antipsychotic medications because these often lead to extreme lethargy, akathisia, and extrapyramidal symptoms, such as cogwheel rigidity and tongue fasciculations," as well as against the use of Benzodiazepines due to concerns regarding addiction, disinhibition, and memory loss. *Id.* ¶ 12.  Doe has repeatedly been hospitalized for mental health treatment related to her Non-Celiac Gluten Sensitivity.  *Id.*

### 1.  Creation of the Advance Directive

On July 19, 2022, Doe "executed" what she refers to as her "Advance Directive and Appointment of Healthcare Agent," using a form available on the Maryland Attorney General's Office website.  (ECF No. 1 ¶ 14.)  In the event that Doe became unable to communicate her wishes, she designated her father as her agent to make her health care choices, as well as her mother as her agent "[i]f [her father] is unable, unwilling, or otherwise engaged."[2]  (ECF No. 15-1; the "Advance Directive").  Per the Advance Directive, Doe's agent has "the power and authority to approve [her] admission to or release from a psychiatric hospital or unit."  *Id.* at p. 5. The Advance Directive was signed by two witnesses, one of whom is Doe's mother.  *Id.*  Doe contends that Maryland has created an "Advance Directive program" pursuant to which an individual who is

---

[2] As explained in Section II.B, the court finds Doe's Advance Directive integral to her Complaint.

competent may make an advance directive for mental health services and designate an agent to make mental health decision.  *Id.* ¶¶ 22–26 (citing MD. CODE ANN. HEALTH-GEN. § 5-602.1).

### 2. *March 2023 Hospitalization*

On March 23, 2023, Doe accidentally ingested gluten and entered a psychotic episode whereupon law enforcement transported her to BWMC's emergency room for treatment.  (ECF No. 1 at p. 2.)  BWMC is a hospital institution that is part of UMMS's medical system; UMMS "substantially controls BWMC's operations." *Id.* ¶ 3.  Defendant McCollum is President and Chief Executive Officer of BWMC. *Id.* ¶ 4.  Defendant Cummings, a medical professional practicing at BWMC, completed Doe's initial psychiatric assessment and subsequently diagnosed Doe with schizophrenia. *Id.* ¶ 33.

Defendant Cummings communicated with Doe's father and informed him, without offering a reason, that Doe's Advance Directive was "not valid under Maryland law."  *Id.* ¶¶ 4, 31–33.  Doe alleges that Defendant Cummings' rejection of her Advance Directive was "simply a pretext . . . to avoid his legal duties to comply with [her] Advance Directive and punish [her] and her family for not following his recommendations after [Doe's] prior hospitalization."[3] *Id.* ¶ 48. Defendant Cummings refused to confer with Dr. Heffner or Doe's parents regarding her medical history and an appropriate treatment plan. *Id.* ¶ 47.  Doe contends that "Defendants' refusal to acknowledge [her] Advance Directive and their refusal to treat [her] in accordance with her Advance Directive, or in accordance with the instructions of her designated agent, [Doe's father], denied [Doe] of her right to participate in and enjoy the benefits of the State's [Advance Directive] Program." *Id.* ¶ 38.

---

[3] Doe voluntarily admitted herself to BWMC in November 2022 during a psychotic episode.  (ECF No. 1 ¶ 30.) Defendant Cummings "remembered" Doe from her November 2022 treatment.  *Id.* ¶ 31.

Doe remained under observation in the BWMC emergency department until March 30, 2023, when she was involuntarily committed to the BWMC psychiatric department for nearly three months.  *Id.* at p. 2.  During her period of observation and involuntary commitment, Doe was subjected to "unlawful physical and chemical restraints," including hard restraints on her wrists and ankles, and involuntary injection of sedative drugs on at least five occasions.  *Id.* ¶¶ 39, 41.  Doe was also subjected to "unlawful seclusion," including locking her in a room alone, not allowing visitors, limiting or preventing her communications with others, preventing her parents' from providing input, and preventing her from meeting privately with anyone (including her attorneys).  *Id.* ¶ 42.

Although Doe repeatedly requested voluntary admission to BWMC, Defendants ignored her request and sought involuntary admission by scheduling a hearing before an Administrative Law Judge ("ALJ") with the Maryland Office of Administrative Hearings on April 11, 2023.  (ECF No. 1 ¶¶ 51–52.)  At the hearing, Defendant Cummings falsely testified that he did not know whether Doe had a treating professional and that Doe had not expressed her wishes to be admitted as a voluntary patient.  *Id.* ¶¶ 56, 63–64.  Additionally, he "fabricate[d] evidence" about Doe's hygiene "to demonstrate that there was no available, less restrictive form of intervention consistent with [Doe's] welfare and safety," by testifying:

> [J]ust reiterating one of the most striking features, I'll try to be brief, of the readmission despite her leaving with a care plan had been, had, in our medical assessment, zero improvement at all in any hygiene, self-grooming, self-care, despite living with a loved one, to the point where to this day, the same hair tie from the last admission is embedded, deeply matted in her hair.

*Id.* ¶ 66.  Defendant Cummings, however, "was in no position to have observed [Doe], or the countless times [Doe's] mother fixed her hair with hair ties between admissions at BWMC.  Dr. Cummings['] testimony regarding [Doe's] hair tie is nothing more than a conjecture."  *Id.* ¶ 67.

The ALJ ruled in favor of Doe's involuntary commitment to the BWMC psychiatric ward, crediting Defendant Cummings' testimony as BWMC's sole witness at the hearing.  *Id.*  ¶ 56.

Thereafter, Defendant Cummings "quickly scheduled a clinical review panel" to obtain a panel order to involuntarily inject Doe with "long-lasting higher dosages of antipsychotic medications." *Id.* ¶ 69.  Doe appealed the order, resulting in the scheduling of another ALJ hearing; the hearing was later cancelled because Defendants withdrew their request citing Doe's compliance with taking her prescribed medications.  In fact, Doe had never refused medication in the first place.  *Id.* ¶ 72.  Still, on April 24, 25, and 26, 2023, Defendant Cummings again "attempted to inject" Doe with antipsychotic medications, which Doe refused. *Id.* ¶ 73.  Defendant Cummings then scheduled another clinical review panel, and on April 26, 2023, he notified Doe that the panel would convene on April 27, 2024, allowing Doe, through counsel, limited time to prepare and coordinate her intended witnesses.  *Id.* ¶¶ 74–80.  The panel affirmed Defendant Cummings' request.  *Id.* ¶ 83.  Doe appealed the panel's finding to an ALJ who ruled in BWMC's favor, again in reliance on Defendant Cummings' testimony.  *Id.* ¶¶ 86, 94.

### 3.  *Evaluations by Dr. Ratner and Dr. Messamore*

On April 21 and May 1, 2023, Dr. Richard Ratner, a psychiatrist and forensic psychiatrist, observed Doe and concluded "there was no longer a basis to hold [her] against her will," because she "no longer appeared actively psychotic." (ECF No. 1 ¶ 115–16.)  "When asked whether there was any basis for maintaining Jane Doe on involuntary status at the time of his interviews, Dr. Ratner stated: 'The answer is an unequivocal "no." She is voluntarily cooperating with her treatment program and seems competent to make treatment decisions for herself at this time.'" *Id.* ¶ 116.  Dr. Ratner's observation was consistent with an evaluation conducted by Dr. Erik Messamore.  *Id.* ¶ 115.

On May 24, 2023, Dr. Messamore, "a psychiatric physician, pharmacologist, and university professor," evaluated Doe and her most recent medical records, and issued a written report that Doe showed no evidence of psychosis or being a danger to herself or others, and that she no longer required inpatient treatment.  (ECF No. 1 ¶¶ 101–102.)  Doe does not allege a doctor/patient or treatment relationship with Dr. Ratner or Dr. Messamore, or any connection between or among Drs. Ratner and Messamore and BWMC.

Upon information and belief, Does alleges that "most patients admitted to BWMC's psychiatric ward who become eligible for release are, in fact, released." *Id.* ¶ 118.  Unlike those patients, however, Doe was subjected to involuntary commitment and treatment, "despite her improvements and eligibility for release," because of her disability and based on the "purported fear that [Doe] would again stop taking the antipsychotic medications Dr. Cummings wanted her to take after discharge." *Id.* ¶¶ 118, 131, 137, 143.

## B.  Procedural Background

Doe (and her parents) have filed "several lawsuits" against Defendants arising from her March 2023 involuntary commitment.[4]  (ECF No. 1 ¶ 119.)  Regarding her previous lawsuits, Doe alleges:

> 119. In response to her unlawfully continued confinement, several lawsuits were filed against the Defendants. On April 20, 2023, [Doe's father] sued the BWMC and UMMS to require them to recognize Jane Doe's Advance Medical Directive and [Doe's father's] appointment as Jane Doe's lawfully designated healthcare agent in *John Doe v. Baltimore Washington Med. Ctr., et al.*, Case No. C-02-CV-23-000764 (Cir. Ct. A.A. County 2023).

> 120. On May 3, 2023, Jane Doe filed a petition for judicial review of the ALJ's decision authorizing the Hospital Defendants to involuntarily inject Jane Doe with psychiatric medications pursuant to Md. Health Gen. Code § 10-708 in *In re Jane Doe*, Case No. C-

---

[4] As explained in Section II.B, the court takes judicial notice of certain relevant public court records in ruling on the Motion.

02-CV-23-000902 (Cir. Ct. A.A. County 2023). On May 5, 2023, Jane Doe filed a petition for writ of habeas corpus to remedy her unlawful detention in *Jane Doe v. Baltimore Washington Med. Ctr., et al.*, Case No. C02-CV-23-000910 (Cir. Ct. A.A. County 2023). On June 6, 2023 Jane Doe filed an emergency motion for judicial release in *Jane Doe v. Baltimore Washington Med. Ctr., et al.*, Case No. C-02- CV-23-001066 (Cir. Ct. A.A. County 2023) . . . .

121. Despite all these lawsuits, the Defendants steadfastly refused to release Jane Doe until her attorneys and the Defendants negotiated a "Consent Order" entered in the underlying habeas case on June 12, 2023. The conditions to which Jane Doe was forced to agree to obtain her freedom in the "Consent Order" are discriminatory and patently unconstitutional: Jane Doe was required to: (1) replace her long-term treating psychiatrist, Dr. Heffner, with another psychiatrist; (2) "continue to take the Invega (paliperidone) 6 mg in pill form daily that was prescribed while in the hospital," (3) use the services of Family Intervention Partners ("FIP") at least once every three months; (4) allow FIP and its providers to act as one of her mental health providers; (5) "instruct her [new] treating psychiatrist to consult with FIP regarding her treatment regime, including . . . prescribed medication;" (6) "follow all recommendations of her [new] treating psychiatrist regarding her treatment and medications/prescriptions;" (7) "accept referral to" and "follow" all "recommendations" made by "the Anne Arundel County Crisis Intervention Team;" (8) "take all prescribed medications that concern her psychiatric health;" and (9) "dismiss, with prejudice, all pending actions against [the Defendants]."

122. The Defendants' continuation of custody of Jane Doe for months after inpatient care was no longer needed or required, and the Defendants' refusal to release Jane Doe from custody unless she agreed to waive her fundamental rights to bodily integrity, to choose her own physicians, and to exercise informed consent for medical treatment, and to dismiss her pending lawsuits constitute forms of discrimination against Jane Doe in violation of the Disability Anti-Discrimination Laws.

*Id.* ¶¶ 119–22.

Doe also filed an administrative agency appeal of the ALJ's involuntary admission decision. (ECF No. 22.)  The Circuit Court for Anne Arundel County, Maryland reversed the ALJ's decision, finding that "the ALJ erred in issuing the Certification and involuntarily

committing [Doe] to BWMC," and that "the ALJ's legal conclusions as to the validity and operability of the Advanced Mental Health Directive [were] legally erroneous." *Id.* at p. 10. In reaching that conclusion, the court explained that "BWMC never officially challenged the validity and enforceability of the Directive," and, without such a challenge and a resulting ruling on its validity, "BWMC should have honored the Directive and allowed [Doe's] father to be her Health Care Agent." *Id.* at p. 8–10. Whether Doe's Advance Directive complied with the Maryland statutory requirements "was not before the court." (ECF No. 26-2.)

In addition to the state lawsuits, Doe has filed three actions in this court arising from her March 2023 involuntary commitment. Doe filed the first action against all Defendants, as well as Todd Mohink (Defendants' counsel in the state court proceedings), on June 9, 2023 (*Doe v. University of Maryland Medical System Corporation et al.*, Case No. 23-cv-1572-SAG) ("*Doe I*"), alleging procedural and substantive due process violations; Doe also filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction ("TRO") for her release from BWMC. (Case No. 23-1572-SAG, ECF Nos 1, 4.) Doe requested, and the presiding judge, Honorable Stephanie Gallagher, ordered that the TRO motion be withdrawn because it was no longer necessary. (Case No. 23-1572-SAG, ECF Nos. 12, 13.) On June 26, 2023, Doe voluntarily dismissed that case with prejudice, apparently pursuant to the Consent Order discussed *supra*. (ECF No. 1 ¶¶ 120–21; Case No. 23-1572-SAG, ECF Nos. 20, 21.)

Doe, accompanied by her parents, then filed a second action against all Defendants, as well as Be-Live-It Therapy LLC and Anne Arundel County, Maryland, in this court on June 22, 2023 (*T.M. et al. v. University of Maryland Medical System Corporation et al.*, Case No. 23-cv-1684-SAG) ("*Doe II*"), seeking declaratory judgment that the Consent Order was void due to duress and violated the Maryland Declaration of Rights and the Due Process Clause of the Fourteenth

Amendment. (Case No. 23-1684-SAG, ECF No. 1 at p. 39.) Judge Gallagher granted the present

Defendants' motion to dismiss, holding, *inter alia*, that Doe's claims were barred by the *Rooker-*

*Feldman* doctrine. (Case No. 23-1684-SAG, ECF Nos. 82, 83.) Judge Gallagher's memorandum

opinion and order closed *Doe II*.

      Doe then filed the present, and third, action against Defendants in this court on December

6, 2023 ("*Doe III*"). (ECF No. 1.) In this third action, Doe asserts the following claims:

> Count I: Violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116(a) against BWMC and UMMS;
>
> Count II: Violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 against BWMC and UMMS;
>
> Count III: Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a against BWMC and UMMS;
>
> Count IV: Battery against BWMC and UMMS; and
>
> Count V: False Imprisonment against all Defendants.

(ECF No. 1 at p. 33–38.)

      Doe alleges:

> BWMC and UMMS, who each receive Federal financial assistance, knowingly, intentionally, and with actual malice excluded Jane Doe from participation in, and denied her the benefits of the [Advance Directive] Program as described herein . . . .
>
> Further, BWMC and UMMS, acting in concert with one another, knowingly, intentionally, and with actual malice discriminated against Jane Doe on account of her disability by, among other things: (1) using unlawful physical and chemical restraints against her; (2) keeping her in seclusion and isolated from the community and her parents without justification; (3) rejecting her legally valid Advance Directive; (4) seeking involuntary commitment in disregard of her Advance Directive and providing false and misleading testimony against her to obtain her involuntary commitment; (5) regardless of whether Jane Doe's involuntary commitment was legally justified, by continuing to keep Jane Doe

in custody long after any reasonable justification ceased to exist; (6) by failing to provide Jane Doe with the necessary training and education needed to avoid further confinement, and (7) by conditioning her freedom upon her agreement to give up fundamental constitutional rights, including her right to bodily integrity which encompasses the doctrine of informed consent and to choose her healthcare providers, and her right to petition the government for redress of her grievances.

*Id.* ¶¶ 130–31, 136–37, 142–43.  Defendants move to dismiss, which Doe opposes.  (ECF Nos. 14, 23.)  The present action is the only remaining open case filed by Doe in this court arising from her March 2023 involuntary commitment.

## II.   LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(6)

A motion asserted under Rule 12(b)(6) "test[s] the sufficiency of a complaint;" it does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).  Therefore, a "Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244.

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and footnote omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "[A] complaint that provides no more than 'labels and conclusions,' or 'a formulaic recitation of the elements of a cause of action,' is insufficient." *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 434 (D. Md. 2014) (quoting *Twombly*, 550 U.S. at 555).  "The [c]ourt must be able to deduce 'more than the mere possibility of misconduct'; the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief." *Evans v. 7520 Surratts Rd. Operations, LLC*, No. 8:21-CV-01637-PX, 2021 WL 5326463, at *2 (D. Md. Nov. 16, 2021) (quoting *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526 (D. Md. 2015)).

**B.  Consideration of Exhibits**

Both parties reference exhibits they ask the court to consider in ruling on the Motion.  The exhibits fall into two general categories: (1) Doe's Advance Directive (ECF No. 15-1), and (2) court documents (many of which are sealed) from one of the parties' cases in state court (and BWMC's appeal documents) (ECF Nos. 22, 26-1, 26-2, 26-3).  No party disputes the authenticity of these documents.

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court generally does not consider evidence outside of a complaint.  The court may properly, however, consider "documents integral to and relied upon in the complaint, . . . so long as the plaintiff does not question their authenticity." *Fairfax v. CBS Corp.*, 2 F.4th 286, 292 (4th Cir. 2021).  "An integral document is a document that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d. 602, 611 (D. Md. 2011) (quoting *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007)).  The court may also "properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts,'"

meaning a fact "not subject to reasonable dispute because it," *inter alia*, "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); FED. R. EVID. 201(b).  *Cf. Kashyap, LLC v. Nat. Wellness USA, Inc.*, No. CIV.A. DKC 11-0459, 2011 WL 2462192, at *3 (D. Md. June 16, 2011) ("[A] court may take judicial notice of facts from a prior judicial proceeding so long as the affirmative defense does not raise a disputed issue of fact.").

Against this backdrop, the court may consider all of the documents referenced in the parties' briefing.  The Advance Directive is integral to the Complaint because its existence purportedly gives rise to the legal rights asserted, and Doe explicitly relies upon it throughout the Complaint.  *See Fairfax*, 2 F.4th at 292, *supra*.  Moreover, the court may take judicial notice of state court records both as matters of public record (as to the documents that are unsealed) and as undisputed adjudicative facts that are accurately available from a source whose accuracy cannot reasonable be questioned.  *See* FED. R. EVID. 201(b), *supra*.

## III.   ANALYSIS

### A.  The Rule against Claim Splitting[5]

Defendants argue that this action should be dismissed because Doe's repeated lawsuits in this court against the same parties arising from the March 2023 hospitalization violates the rule against claim splitting.  (ECF No. 14-1 at p. 3.)  In response, Doe contends that her separate actions do not constitute claim splitting because the parties in *Doe II* and *Doe III* are not identical, and they involve "different claims arising from different wrongs."  (ECF No. 23 at p. 5–7.)

---

[5] "A motion to dismiss asserting a violation of the claim splitting doctrine is properly raised under Fed. R. Civ. P. 12(b)(6)."  *Brightview Grp., LP v. Glynn*, No. CV SAG-21-3027, 2022 WL 743937, at *6 (D. Md. Mar. 11, 2022).

"The rule against claim splitting 'prohibits a plaintiff from prosecuting [her] case piecemeal and requires that all claims arising out of a single wrong be presented in one action.'" *Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 635 (4th Cir. 2015) (quoting *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.,* 273 F. App'x. 256, 265 (4th Cir. 2008)). "In a claim splitting case, the second suit will be barred if the claim involves the same parties and 'arises out of the same transaction or series of transactions as the first claim.'" *Sensormatic Sec. Corp.*, 273 F. App'x at 265 (citing *Trustmark Insur. Co. v. ESLU, Inc.,* 299 F.3d 1265, 1269–70 (11th Cir. 2002)). "The rule against claim splitting is one of the principles of res judicata." *Id.* at 264. "When one suit is pending . . . , a plaintiff has no right to assert another action 'on the same subject in the same court, against the same defendant at the same time.'" *Id.* at 265 (quoting *Curtis v. Citibank, N.A.,* 226 F.3d 133, 139–40 (2d Cir. 2000)).

"The determination of whether two suits arise out of the same cause of action . . . does not turn on whether the claims asserted are identical. Rather, it turns on whether the suits and the claims asserted therein 'arise out of the same transaction or series of transactions or the same core of operative facts.'" *Pueschel v. United States*, 369 F.3d 345, 355 (4th Cir. 2004) (quoting *In re Varat Enters., Inc.,* 81 F.3d 1310, 1316 (4th Cir. 1996)); *see Rousseau v. Howard Cnty., Md.*, No. CIV. JFM-09-CV-1079, 2009 WL 4018551, at *2 (D. Md. Nov. 19, 2009), *aff'd on other grounds,* 425 F. App'x 193 (4th Cir. 2011) (providing that "[t]he claims need not be identical for the rule against claim splitting to apply. Rather, the suits and claims asserted therein need only arise out of the same transaction or series of transactions or the same core of operative facts" (citations omitted)). That "different factual evidence" may be required for the respective claims is not dispositive; the question is whether "the case as a whole arises from a different nucleus of facts or a different transaction." *Rousseau*, 2009 WL 4018551, at *3.

13

Here, it is plain that *Doe II* and *Doe III* (and *Doe I* for that matter) involve the same parties (Doe and Defendants) and arise out of the same series of transactions. *See Sensormatic Sec. Corp.*, 273 F. App'x at 265, *supra*. All Defendants in the present action were parties to *Doe II*. That additional parties existed in *Doe II* is of no moment, because Doe and all Defendants here were parties to *Doe II*. *Cf. Rousseau*, 2009 WL 4018551, at *3 ("[T]he fact that some of the plaintiffs and defendants are different in the instant case does not cut against dismissal for claim splitting. The Defendants in this case who were not involved in *Kendall* should have been added in that case. Failure to add them does not justify bringing a duplicative suit. Similarly, Plaintiffs Kendall, Martin, and Rousseau cannot bring a duplicative suit simply by finding a fourth plaintiff to join it."). Moreover, the allegations in *Doe II* and *Doe III* arise from the same transaction or series of transactions—Doe's March 2023 admission to BWMC's emergency and psychiatric departments, including Defendants' refusal to acknowledge or give force to the Advance Directive, insistence on Doe's involuntary commitment, and efforts to subject Doe to involuntary antipsychotic medication injections.

Doe claims that *Doe II* "has nothing directly to do with [her] hospitalization or involuntary commitment at BWMC." The court disagrees. That remedies sought in *Doe II* are different from remedies sought here is not determinative of the issue. *See Pueschel v. United States*, 369 F.3d at 355, *supra*. There can be no plausible dispute that the claims here and those in *Doe II* arise from the same nucleus of factual allegations. No fewer than twenty (20) pages of the *Doe II* complaint pertain to Doe's admission and involuntary commitment to BWMC, her Advance Directive, and involuntary injection of Doe with antipsychotic medication; these are the core facts that form the basis for her claims there and in the instant action. (Case No. 23-1684, ECF No. 1 ¶¶ 27–180.)

Accordingly, the court concludes that Doe has violated the rule against claim splitting.  The remaining question pertains to the appropriate treatment of this action.  Defendants seek dismissal, whereas Doe argues that a stay or consolidation with *Doe II* is the proper remedy.  This court's analysis in *Brightview Group, LP v. Glynn* provides helpful guidance on balancing the relevant interests to arrive at an appropriate remedy:

> Having determined that the prohibition on claim splitting applies to the instant action, this Court must now fashion a remedy. . . . In fashioning a remedy, courts balance the "interests of judicial economy and avoiding vexatious litigation" against "the plaintiff's interest in bringing the second suit." "Often, dismissal is appropriate where the plaintiff files a second suit after being denied leave to amend to add those claims to the first action."
>
> Under present circumstances, "the 'interests of judicial economy and avoiding vexatious litigation' substantially outweigh [Brightview's] interest in bringing the instant suit." As of the filing of this Complaint, the parties have litigated Brightview's claims against Dingman, Teeters, and Monarch for nearly three years, during which time they have completed discovery, submitted dispositive motions that were resolved by this Court, and proceeded toward an upcoming trial. Although Brightview urges that this Court may conserve judicial resources by consolidating the instant case with *Brightview I*, such a remedy would still require the parties to reopen discovery and to proceed through motions practice on the new claims. "Such relitigation is the antithesis of judicial economy."

No. CV SAG-21-3027, 2022 WL 743937, at *12 (D. Md. Mar. 11, 2022) (footnote and citations omitted).

Here, Doe did not file *Doe III* after being denied leave to amend in *Doe II*, and the parties have not engaged in extensive litigation like discovery and Rule 56 motions practice.  *See Mason v. Montgomery Cnty.*, No. PWG-13-1077, 2015 WL 3891808, at *3 (D. Md. June 23, 2015), and *Brightview*, 2022 WL 743937, at *12, *supra*.  The court is also not persuaded that Doe's piecemeal litigation efforts were intentional impermissible gamesmanship.  Based on these conclusions, a stay or consolidation with *Doe II* would ordinarily be a sound result.  *Mason*, 2015 WL 3891808,

15

at *3 (citation omitted).  Importantly, however, the landscape of the parties' litigation has materially changed since the present filings – Doe's claims in *Doe II* have been dismissed with prejudice, a ruling which Doe has appealed (by notice of appeal filed July 24, 2024).  The appeal is in its infancy.  No briefing has yet been filed – the opening brief is due on September 23, 2024 – and the Fourth Circuit has not determined whether oral argument will be scheduled.  (United States Court of Appeals for the Fourth Circuit, Case No. 24-1707, Doc. No. 12.)

As a practical matter, consolidation is no longer possible.  In view of the status of the appeal of *Doe II*, the court finds that a stay of this action would disserve the interests of judicial economy, including the court's management of its docket, avoiding vexatious litigation, and the various (sometimes competing) interests of the parties to avoid protracted litigation where reasonably possible.  Given the limited option of a stay to address Doe's impermissible claim splitting, and the unappealing nature of that option for the reasons stated, the court opts to address Defendants' remaining arguments on the merits of Doe's claims.  As set forth below, the court concludes that dismissal of Doe's Complaint is warranted for failure to state a claim.

## B.  Doe's Federal Law Claims

Doe asserts violations of federal law under the Affordable Care Act, 42 U.S.C. § 18116(a) (Count I), the ADA, 42 U.S.C. § 12132 (Count II), and the Rehabilitation Act, 29 U.S.C. § 794a (Count III).  Doe's federal claims are based on the same core allegations—Defendants unlawfully denied Doe the benefits of the "[Advance Directive Program]" and discriminated against her based on her disability by:

> (1) [U]sing unlawful physical and chemical restraints against her;
> (2) keeping her in seclusion and isolated from the community and
> her parents without justification; (3) rejecting her legally valid
> Advance Directive; (4) seeking involuntary commitment in
> disregard of her Advance Directive and providing false and
> misleading testimony against her to obtain her involuntary

16

> commitment; (5) regardless of whether Jane Doe's involuntary
> commitment was legally justified, by continuing to keep Jane Doe
> in custody long after any reasonable justification ceased to exist; (6)
> by failing to provide Jane Doe with the necessary training and
> education needed to avoid further confinement, and (7) by
> conditioning her freedom upon her agreement to give up
> fundamental constitutional rights, including her right to bodily
> integrity which encompasses the doctrine of informed consent and
> to choose her healthcare providers, and her right to petition the
> government for redress of her grievances.

(ECF No. 1 ¶¶ 130–31, 136–37, 142–43.)  Defendants seek dismissal of Doe's federal claims on

the grounds that (1) Doe's Advance Directive failed to meet the statutory requirements as a matter

of law, and (2) her allegations based on medical treatment cannot sustain her federal claims.  (ECF

No. 14-1 at p. 5–13.)

### 1. *Applicable Pleading Standards*

Doe's claims under the Affordable Care Act, the ADA, and the Rehabilitation Act are

subject to similar standards.  The anti-discrimination provision of the Affordable Care Act

provides: "an individual shall not, on the ground prohibited under," relevant here, the

Rehabilitation Act, "be excluded from participation in, be denied the benefits of, or be subjected

to discrimination under, any health program or activity, any part of which is receiving Federal

financial assistance . . . ."  42 U.S.C. § 18116(a); *see Basta v. Novant Health Inc.*, 56 F.4th 307,

314 (4th Cir. 2022) (same).  The enforcement mechanisms available under the Rehabilitation Act

similarly apply to violation of this provision of the Affordable Care Act.  42 U.S.C. § 18116(a).

Relatedly, under Title II of the ADA, "no qualified individual with a disability shall, by reason of

such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42

U.S.C. § 12132.  Finally, under the Rehabilitation Act, "[n]o otherwise qualified individual with a

disability . . . shall, solely by reason of her or his disability, be excluded from the participation in,

be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ."  29 U.S.C. § 794.

Courts analyze claims under the Affordable Care Act and the Rehabilitation Act together, because "these claims rise and fall together." *Basta*, 56 F.4th at 314.  Relatedly, courts construe the Rehabilitation Act and the ADA "to impose similar requirements." *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 256 (4th Cir. 2022) (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012)). "[D]espite the different language these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability." *Id.* (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012)).

Accordingly, for all of Doe's federal claims, she must allege that she is a "disabled individual" under the Rehabilitation Act (and the ADA) who was otherwise qualified to participate in the offered activity, or to enjoy its benefits, and that the program administering the activity receives federal financial assistance. *Basta v. Novant Health Inc.*, 56 F.4th 307, 315 (4th Cir. 2022) (citing *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 461–62 (4th Cir. 2012)). The Rehabilitation Act and the ADA differ with respect to the causation element. *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461–62 (4th Cir. 2012). Doe must allege that she was "excluded from such participation or enjoyment solely by reason of" her disability for her Affordable Care Act and Rehabilitation Act claims, and that her disability was a "motivating cause" of her exclusion for her ADA claim. *Id.*

Given the applicable and overlapping pleading standards, the court considers Doe's federal claims together.

## 2. *Refusal to Acknowledge the Validity of the Advance Directive*

Doe asserts that Defendants' refusal to acknowledge the validity of her Advance Directive resulted in denial of benefits under the purported Advance Directive Program, and thus violated her rights under the federal statutes.  (ECF No. 1 ¶¶ 28–38, 130, 136, 142.)  Defendants argue that her claims fail to the extent they rely on the Advance Directive because it did not meet the statutory requirements under Maryland law.  (ECF No. 14-1 at p. 7–8.)  Defendants therefore challenge Doe's qualification for the Advance Directive Program, to the extent such a program exists, and that she was excluded from participation therein by reason of her disability.

Under Maryland's Health Care Decisions Act, "[a]n individual who is competent may make an advance directive to outline the mental health services which may be provided to [her] if [she] becomes incompetent and has a need for mental health services either during, or as a result of, the incompetency."  MD. CODE ANN., HEALTH-GEN. § 5-602.1.  An advance directive is "[a] witnessed written or electronic document, voluntarily executed by the declarant in accordance with the requirements of" Maryland's Health-General article at section 5-601(b)(1).  *Id.* § 5-601(b)(1). According to the Maryland statute, a written advance directive, as is the case here, must "be dated, signed by or at the express direction of the declarant, and subscribed by two witnesses in the physical presence or electronic presence of the declarant."  *Id.* § 5-602(c)(1)(i).   Through any advance directive, an individual may appoint "an agent to make health care decisions for the individual under the circumstances stated in the advance directive."  *Id.* § 5-602(b)(2).  An agent "may not serve as a witness" for an advance directive.  *Id.* § 5-602(c)(2)(i).  This proscription is reiterated at section 5-603 of the statute under the "Selection of Health Care Agent" portion of the Advance Directive form: "[a]nyone selected as a health care agent . . . may not be a witness."  *Id.* § 5-603.

19

Therefore, in sum, the Health Care Decisions Act requires that an advance directive be signed by two witnesses, neither of whom may be designated as a health care agent. It is undisputed that Doe's Advance Directive identifies both her father and mother as health care agents – her father is identified first and her mother in the event her father was "unable, unwilling, or elsewhere engaged." (ECF No. 15-1 at p. 4.) It is also undisputed that Doe's mother signed the Advance Directive as a witness. *Id.* at p. 5. According to a plain reading of the law, therefore, Doe's Advance Directive fails to meet the requirements and conditions of an advance directive under the Health Care Decisions Act.

Doe urges that her Advance Directive complies with the statute, because, as the "alternative health care agent," her mother was permitted to sign as a witness. (ECF No. 23 at p. 8.) Doe's position lacks support in the law. Maryland courts and this court "follow[] the general principles of statutory interpretation." *Johnson v. Mayor of Balt.*, 430 Md. 368, 377 (2013). In *Johnson*, the Supreme Court of Maryland explained the general principles of statutory interpretation:

> First, if the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end. Second, when the meaning of the plain language is ambiguous or unclear, we seek to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based. Last, applying a canon of construction specific to the Act, if the intent of the legislature is ambiguous or remains unclear, we resolve any uncertainty in favor of the claimant. This Court, however, may not stifle the plain meaning of the Act, or exceed its purposes, so that the injured worker may prevail.

*Johnson v. Mayor of Baltimore*, 430 Md. 368, 377 (2013) (citations omitted).

The plain meaning of the Health Care Decisions Act is that no person identified as a health care agent may serve as a witness. MD. CODE ANN., HEALTH-GEN. § 5-602(c)(2)(i). The statutory

Advance Directive form at § 5-603 refers to selection of a "Primary [Health Care] Agent" and a "Back-up [Health Care] Agent," and expressly confirms section 5-602(c)(2)(i)'s prohibition that "[a]nyone selected as a health care agent . . . may not be a witness." *Id.* § 5-603. As Defendants point out, the statute makes no allowance for a health care agent to serve as a witness under any circumstances, *e.g.,* the "back-up" agent may not serve as a witness merely because there is a "primary" agent. The prohibition on agent-as-witness is clear, unambiguous, and without exception. It is, as stated above, undisputed that Doe designated her mother as a health care agent ("I select the following person to act in this role" under the heading "Appointment of Health Care Agent") and her mother signed the Advance Directive as a witness. (ECF No. 15-1.) Doe's construction of the statute inserts language that does not appear in, and changes the meaning of, the statute. The court concludes, therefore, that Doe's Advance Directive fails under Maryland law.

Doe argues further that her position is bolstered by the state court's holding that her Advance Directive was "legally binding on BWMC." (ECF No. 23 at p. 8) The court disagrees with Doe's reading of the state court's opinion. The state court found, based on the record before it, that "BWMC never officially challenged the validity and enforceability of the [Advance] Directive;" the court further opined as follows:

> Without a challenge of the [Advance] Directive and a formal ruling as to its validity and enforceability, BWMC should have honored the [Advance] Directive and allowed Petitioner's father to be her Health Care Agent. . . . Moreover, the ALJ's conclusions (1) that the document was not persuasive and (2) that, even though it may be legally important for many reasons, BWMC was not bound by the [advance] directive because it was not argued to her by either party, is legally erroneous. The Court finds that there is no evidence to support this conclusion. The ALJ heard minimal argument on the [Advance] Directive and did not make any factual findings as to its validity and enforceability but made the conclusion that the document was not persuasive and BWMC was not bound by the

> [Advance] Directive. Accordingly, the ALJ's decision is reversed because it is legally erroneous and not supported by any evidence.

(ECF No. 22 at p. 8–10.)

The state court did not hold that the Advance Directive was "legally binding on BWMC," or that it comports with the statutory requirements. Regardless, respectfully, the state court's holding has little to no relevance here, as this court is not reviewing whether the ALJ properly concluded Doe met the requirements for involuntary commitment under state law, but rather whether Doe (and her Advance Directive) qualified for what Doe proposes is the Advance Directive Program under Maryland law. To that end, it bears noting that Doe's allegations are strictly that her Advance Directive was valid and enforceable under Maryland law; she does not assert any alternative theory, *e.g.*, that other patients' unenforceable advance directives were followed and thus Defendants' decision not to follow hers was pretextual, or that Defendants failed to follow some required specific protocol upon determining that her Advance Directive was invalid.[6]

Accordingly, Doe's claim that Defendants unlawfully denied her participation in, and the benefits of, the purported Advance Directive Program fails as a matter of law, because her Advance Directive does not meet the basic statutory requirements under Maryland law.[7] Therefore, the Motion will be granted as to Doe's claims for violations of the Affordable Care Act, Rehabilitation Act, and ADA based on failure to comply with her Advance Directive.

---

[6] Doe also avers that the court must accept as true her allegation that the Advance Directive was valid under law. (ECF No. 23 at p. 9.) Doe's assertion does not pass muster and is contrary to binding Supreme Court precedent. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court is not obligated to accept Doe's legal conclusion as true, especially in view of the fact that Advance Directive demonstrates on its face that the proposed legal conclusion is false.

[7] Because the court concludes that Doe's Advance Directive does not comply with Maryland law, Doe's argument regarding *Hargrave v. Vermont*, 340 F.3d 27 (2d Cir. 2003), is inapplicable.

### 3. *Discrimination During Involuntary Commitment*

Defendants also argue that because Doe's claims are founded solely on allegedly improper medical decisions, she does not plausibly allege discrimination by reason of her disability. (ECF No. 14-1 at p. 9–13.) Doe counters that her allegations go beyond improper or negligent medical care. (ECF No. 23 at p. 10–12.)

"Unjustified isolation . . . is properly regarded as discrimination based on disability." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999). In *Olmstead*, the Supreme Court addressed the question of "whether the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions." 527 U.S. at 587. The Supreme Court answered that question with a "qualified yes," explaining that "[s]uch action is in order when the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated . . . ." *Id.* This court has held that, "under *Olmstead,* the plaintiffs can meet this requirement [of demonstrating discrimination by reason of disability] for Title II discrimination by showing that they remained unjustifiably institutionalized despite their eligibility for community-based treatment." *Williams v. Wasserman*, 164 F. Supp. 2d 591, 630 (D. Md. 2001); *see also Z.S. v. Durham Cnty.*, No. 1:21CV663, 2022 WL 673649, at *3 (M.D.N.C. Mar. 7, 2022) (holding that the plaintiff sufficiently alleged discrimination "on the basis of his disability by unjustifiably keeping Plaintiff in institutional isolation").

Critically, however, claims of "inadequate health care, negligent health care, or even medical care amounting to medical malpractice" do not constitute a violation of the ADA (or the

Rehabilitation Act and the Affordable Care Act).[8] *Cox v. Getachew*, No. GJH-19-2731, 2021 WL 765687, at *9 (D. Md. Feb. 26, 2021) (citing cases); *see, e.g.*, *McGugan v. Aldana-Bernier*, 752 F.3d 224, 231–32 (2d Cir. 2014) (holding that "section 504 does not authorize a claim for malpractice."); *Bryant v. Steele*, 25 F. Supp. 3d 233, 242–43 (E.D.N.Y. 2014) ("[N]either the ADA nor the Rehabilitation Act applies to claims regarding the quality of mental health services . . . ."); *see also Buchanan v. Maine*, 469 F.3d 158, 174–75 (1st Cir. 2006) (explaining that "[t]his circuit . . . has recognized the distinction between ADA claims based on negligent medical care and those based on discriminatory medical care" (citations omitted)).  "[T]he ADA prohibits discrimination because of disability, not inadequate treatment for disability." *Boyd v. Tesemma*, No. 2:14CV196, 2016 WL 9211757, at *2 (E.D. Va. Jan. 12, 2016) (quoting *Simmons v. Navajo Cty.*, 609 F.3d 1011, 1021–22 (9th Cir. 2010)).

Moreover, "an accusation that an individual was involuntarily committed on the basis of a mental disability 'cannot serve as a basis for an ADA [or Rehabilitation Act] . . . violation for disability discrimination because such a finding would convert every involuntary commitment transport into a civil rights violation.'"  *Bryant v. Steele*, 25 F. Supp. 3d 233, 242–43 (E.D.N.Y. 2014) (quoting *Estate of Awkward v. Willingboro Police Dept.,* No. 07 Civ. 5083(NLH), 2010 WL 3906785, at *13 (D.N.J. Sept. 30, 2010)).

On the distinction between disability discrimination claims and claims arising from treatment related to a plaintiff's disability, the Second Circuit's thoughtful analysis in *McGugan v. Aldana-Bernier* is helpful:

> The term "discrimination" is potentially confusing in the context of medical treatment. The word has two very different significations— one positive, the other pejorative. In its positive sense, one discriminates by drawing distinctions that are relevant to the qualities or characteristics of the thing observed. In its negative or

---

[8] Doe does not dispute this proposition.  (ECF No. 23 at p. 11.)

pejorative sense, one discriminates by withholding advantages or inflicting disadvantages on the basis of irrelevant criteria, under the influence of irrational bias. A doctor who administers a medical treatment to a patient (or withholds it) because the doctor's medical training leads her to conclude that the treatment is medically appropriate (or inappropriate) is practicing the benign form of discrimination. This is true even if the doctor's medical understanding is flawed and her knowledge is deficient. On the other hand, a doctor who inflicts or withholds a type of medical treatment for reasons having no relevance to medical appropriateness— reasons dictated by bias rather than medical knowledge—is practicing the pejorative form of discrimination. It is clear that the intention of the Rehabilitation Act in prohibiting discrimination is to prohibit the pejorative, and not the benign, form. Thus a doctor may refuse to prescribe a particular treatment, which the disabled patient has requested, because of the doctor's assessment (based on an appraisal of the patient's medical condition) that the treatment would be harmful. The doctor's refusal is not discrimination in violation of the statute, even if the doctor's medical analysis is flawed. Such a decision may be malpractice, but it is not discrimination. Section 504 does not authorize a claim for malpractice. *See Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir.1996) (concluding that a similar provision of the Americans with Disabilities Act "does not create a remedy for medical malpractice").

*McGugan v. Aldana-Bernier*, 752 F.3d 224, 231–32 (2d Cir. 2014).  Thus, "a plaintiff pleads an actionable claim of discrimination in the medical treatment context under the ADA or the Rehabilitation Act if she alleges that the defendants made treatment decisions based on factors that are 'unrelated to, and thus improper to consideration of' the inquiry in question." *Id.* at 234.  This analysis "prevents an interpretation of the Rehabilitation Act that would federalize many (if not most) claims for medical malpractice." *Id.*

Doe's allegations (accepted as true) concern her medical treatment by Defendants while she was subject to involuntary commitment.  Doe acknowledges that she was experiencing a psychotic episode, which ultimately formed the basis for her involuntary commitment.  Doe's allegations further demonstrate that Defendants' alleged actions, which Doe claims were

discriminatory, arose in Defendants' treatment of Doe's psychotic episode.  Doe's description of the alleged discrimination—that Defendants subjected her to unlawful physical and chemical restraints, limited her communication with individuals outside the hospital, continued to hold her after the involuntary commitment was no longer justified, failed to provide her with training or education, and required her to sign the Consent Order to be released (which related at least in large part to her treatment post-commitment)—all arise from Defendants' diagnosis and treatment of Doe's psychosis, proper or not.  (ECF No. 1 ¶¶ 131, 137, 143.)  That Doe alleges Defendants' actions were improper, even medically unnecessary, does not change that fact.  Further, Doe alleges no unrelated or improper considerations related to one of her other alleged disabilities separate and distinct from her disability for which she was receiving care.  *See McGugan*, 752 F.3d at 234, *supra*.  Doe, therefore, does not allege unlawful discrimination by conduct (or inaction) that extends beyond Defendants' allegedly improper treatment and care of her disability.  Doe thus fails to state a plausible claim for violation of the Affordable Care Act, ADA, and Rehabilitation Act.

*Olmstead* does not compel a different result.[9]  It is true that *Olmstead* demonstrates that unjustified isolation may sustain a claim for disability discrimination where the treating professionals have determined it appropriate for a patient to receive care in a less restrictive setting, but that is not what Doe alleges here; and no reasonably permissive construction of the allegations support such a conclusion.  *See* 527 U.S. at 597.  Doe does not allege that her treating professional, Defendant Cummings (or any other BWMC treating physician), determined her involuntary commitment was no longer legally or medically justified/necessary, or that Doe was eligible for

---

[9] Likewise, *Z.S. v. Durham Cnty.*, No. 1:21CV663, 2022 WL 673649, at *1 (M.D.N.C. Mar. 7, 2022), relied upon by Doe, does not yield a different outcome.  *Z.S.* concerned an infant in the custody of the defendant who determined the infant was medically stable and eligible for discharge.

care in a less restrictive setting (at least until the Consent Order was signed).  Doe alleges only that her involuntary commitment was no longer legally justified apparently based on her personal opinion and the assessment of two unrelated and non-treating doctors who assessed Doe more than a month following her commitment.  While opinions of other medical professionals would surely be relevant and admissible to prove the merits of Doe's claims that Defendants rendered improper or inappropriate care, they have no place in the court's evaluation of whether Doe's allegations state a claim of disability discrimination.

Accordingly, the Motion will be granted as to Counts I, II, and III.

### C.  Doe's State Law Claims

Doe also asserts Maryland common law claims of battery and false imprisonment (Counts IV and V, respectively).  Defendants argue the claims must be dismissed because her claims concern medical injuries by health care providers that are subject to the mandatory health claims arbitration process under the Maryland Health Claims Act ("HCA"), MD. CODE ANN., CTS. & JUD. PROC. § 3-2A-01, *et seq.*  (ECF No. 14-1 at p. 13–17.)  In opposition, Doe asserts that her common law claims are not subject to the HCA, and that Defendant McCollum is not a health care provider within the meaning of the HCA.  (ECF No. 23 at p. 12–17.)

A plaintiff who alleges "a medical injury within coverage of the [HCA]," is "required to file those claims in the Health Care Alternative Dispute Resolution Office ('ADR Office') as a condition precedent to" litigation.  *Davis v. Frostburg Facility Operations, LLC*, 457 Md. 275, 280 (2018).  Where a plaintiff fails to do so, the action must be dismissed.  *See Davis v. Frostburg Facility Operations, LLC*, 457 Md. 275, 289 (2018) ("[W]here a cause of action depends on satisfaction of a condition precedent, the plaintiff 'must allege performance of such condition or show legal justification for nonperformance.'" (quoting *Cannon v. McKen*, 296 Md. 27, 38)).

Under the HCA, a "plaintiff claiming a 'medical injury' committed by a 'health care provider' and more than $30,000 in damages must first file their claims with the ADR Office." *Id.* at 285 (quoting MD. CODE ANN., CTS. & JUD. PROC. § 3-2A-01(a)(1)). A medical injury under the HCA is an "injury arising or resulting from the rendering or failure to render health care." MD. CODE ANN., CTS. & JUD. PROC. § 3-2A-01. A health care provider under the HCA refers to, relevant here, hospitals and physicians "licensed or authorized to provide one or more health care services in Maryland." *Id.* § 3-2A-01(f)(1). The purpose of the HCA "is to screen malpractice claims, ferret out meritless ones, and, in theory, thereby lower the cost of malpractice insurance and the overall costs of health care." *Davis*, 457 Md. at 285 (quoting *Adler v. Hyman*, 334 Md. 568, 575 (1994)).

The Supreme Court of Maryland's decision in *Davis* provides an instructive review of the scope of the HCA in the context of intentional tort claims:

> We again examined the scope of the HCA in *Nichols v. Wilson*, 296 Md. 154, 460 A.2d 57 (1983). *Nichols* involved claims that greatly differed from the plaintiff's claims in *Cannon*. Nichols sued Dr. Wilson for injuries suffered by her daughter. The younger Nichols went to Dr. Wilson for a suture removal procedure. Alleging that Dr. Wilson slapped her daughter across the face with an open palm, Nichols filed a three-count complaint for assault and battery, negligence, and intentional infliction of emotional distress. *Id.* at 155 n.2, 460 A.2d 57. We reiterated our understanding of the coverage of the HCA: "[I]t is only those claims for damages where there has been a violation of the health care provider's professional duty to exercise care which are within the [Health Claims] Act." *Id.* at 161. The Legislature did not intend for the HCA to cover the intentional torts of assault and battery or intentional infliction of emotional distress, even if such actions occurred while a physician rendered health care. *Id.*
>
> The Court took a more expansive view of the HCA's jurisdiction in *Jewell v. Malamet*, 322 Md. 262, 587 A.2d 474 (1991), involving allegations of assault during a medical exam. There the plaintiff alleged that she suffered injuries from intentional torts committed by a physician who sexually battered and assaulted her during a

medical examination. *Id.* at 267–69, 587 A.2d 474. The plaintiff did not file her claim in the ADR Office, but instead proceeded directly to the trial court. The defendant physician contended that the allegedly injurious conduct was part of a legitimate medical examination and the dispute required further investigation of the professional standard of care. *Id.* at 275, 587 A.2d 474. Determining whether a claim falls under the HCA depends on "the factual context in which the tort was allegedly committed**.**" *Id.* at 271–72, 587 A.2d 474 (emphasis added). Ultimately, we ruled for the physician, dismissing the complaint—because we could not conclude "that the claims set out were not for medical injury . . . " *Id.* at 274–75, 587 A.2d 474.

The plaintiff fared no better in *Goicochea v. Langworthy*, 345 Md. 719, 694 A.2d 474 (1997), another physician case. Following a hernia examination conducted by Dr. Goicochea, Langworthy complained of persistent pain and discomfort in his groin area. *Id.* at 722, 694 A.2d 474. He sued Dr. Goicochea for assault and battery. The trial court dismissed the complaint after clarifying that the plaintiff's factual allegations failed to demonstrate that the plaintiff's claims arose from conduct during the provision of medical care and fell beyond the HCA. *Id.* at 723, 694 A.2d 474. We reiterated that the proper initial forum for a claim "depends upon the factual context in which the tort was allegedly committed." *Id.* at 728, 694 A.2d 474. If a claimant's injury "resulted from conduct completely lacking in medical validity in relation to the medical care rendered, the [HCA] is inapplicable, and the action may proceed without first resorting to arbitration." *Id.* We affirmed dismissal because the plaintiff had failed to plead any factual basis upon which the trial court could properly conclude that the physician's actions had "no conceivable medical validity." *Id.* at 729, 694 A.2d 474.

*Id.* at 289–91 (emphasis omitted).  The progression of Maryland common law demonstrates an "expansive view of the HCA's jurisdiction"—allegations of intentional torts do not remove claims from the scope of the HCA.  *Id.* at 289–91, 295 (citing *Jewell*, 322 Md. at 267–69 and *Goicochea*, 345 Md. at 722).

To fall within the scope of the HCA, "a plaintiff must allege a breach of a professional duty of care during the rendering of medical care."  *Id.* at 292.  To determine whether a plaintiff's allegations have so pled, the court looks to "the factual circumstances and context of a plaintiff's

claims, not merely to the type of claim or the character of the defendant." *Id.* Ultimately, if a plaintiff's alleged injury "resulted from conduct completely lacking in medical validity in relation to the medical care rendered, the [HCA] is inapplicable." *Id.* at 291 (quoting *Goicochea*, 345 Md. at 729); *see Afamefune v. Suburban Hosp., Inc.*, 385 Md. 677, 695 (2005) ("[W]hen it is clear from the allegations of the complaint that the plaintiff's claimed injury was not inflicted during the rendering or failure to render medical service or that it was the result of conduct having utterly no medical validity in relation to the medical care rendered, the action properly proceeds in Circuit Court, without first resorting to arbitration." (quoting *Goicochea,* 345 Md. at 728)).

In considering whether Doe's claims fall within the scope of the HCA, *Long v. Rothbaum* is instructive. 68 Md. App. 569 (1986). In *Long*, the Appellate Court of Maryland was tasked with determining "whether the torts alleged [in that case were] among those intentional torts that are covered by the [HCA]." *Id.* at 575. The state common law torts alleged—false imprisonment and intentional infliction of emotional distress—arose from the plaintiff's transport to the hospital as a suicide risk and subsequent involuntary commitment. *Id.* at 571. The court noted:

> The complaint shows that Long was brought to Franklin Square Hospital because he was thought to be a suicide risk. He was kept there involuntarily because the health care providers at that hospital were attempting to treat him for that problem. His claimed false imprisonment, from which the asserted emotional distress arose, was caused by those health providers who executed Physicians' Certificates for mentally disordered that are required for involuntary admission to mental health facilities. Long argues that the issuance of the certificates did not comply with the procedure required by COMAR 10.21.01.03.
>
> Those improperly executed certificates, according to the complaint, caused Long's transportation to and false imprisonment at Taylor Manor. The health care providers at that facility falsely imprisoned Long there, because they relied on the obviously improper and incomplete Physicians' Certificates and kept him there, without any medical reason for doing so, in violation of COMAR 10.21.01.04E (providing for prompt review of the status of an involuntary mental

> committee). In addition, the complaint charges that the Taylor
> Manor personnel failed to comply with other COMAR provisions
> dealing with the rights of involuntary committees. . . .
>
> It is apparent to us that what Long's complaint in fact alleges is
> misdiagnosis of his condition and the subsequent rendition of
> unnecessary and, therefore, improper care. The appellees' alleged
> failure to comply with various COMAR provisions dealing with the
> treatment of involuntary mental committees is in effect a charge of
> malpractice—the failure to adhere to a standard of care required (by
> COMAR) of certain health care providers.
>
> The case before us is unlike *Nichols.* In that case the cause of action
> (the slap) did not arise from a negligent, reckless, or unnecessary
> suture removal. Rather, the slap was a gratuitous act that obviously
> was not part of the medical treatment. Here, the cause of action is
> based on the treatment itself and other actions that are said to be in
> violation of mandated health care standards."

*Long v. Rothbaum*, 68 Md. App. 569, 575–77 (1986).  The plaintiff's claims arising from his

misdiagnosis, commitment, and unnecessary and improper medical care were thus sufficiently

related to his medical treatment to fall within the scope of the HCA.

This court is similarly tasked to determine whether Doe alleges torts covered by the HCA

or whether her allegations of intentional conduct amounting to "gratuitous act[s] that obviously

[were] not part of [her] medical treatment." *Id.*  In view of *Long* and its progeny, it is clear that

Doe's alleged torts are sufficiently related to her medical treatment such that they are covered by

the HCA.  Here, as in *Long*, Doe's allegations arise from Defendants' failure to appropriately

diagnose, identify, or recognize her condition, and their "subsequent rendition of unnecessary and,

therefore, improper care."  *Long*, 68 Md. App. At 576.  Such allegations arise "as a result of the

rendering of medical treatment" per the HCA.  *Afamefune ex rel. Afamefune v. Suburban Hosp.,

Inc.*, 385 Md. 677, 693–94 (2005).  Moreover, even to the extent Doe alleges that Defendants took

these actions against her knowingly and intentionally, the allegations still arise in the context of

medical diagnosis and treatment—whether valid or not—and were not completely distinct from

her medical care, *e.g.*, slapping a patient in the face while performing a procedure.  *See Long*, 68 Md. App. At 576–77, *supra*.  As such, Doe was obliged to allege that she had satisfied the condition precedent under the HCA prior to filing suit.  Having failed to do so, her state law claims must be dismissed.

Regarding Doe's contention that Defendant McCollum is not a medical provider under the HCA (and therefore the false imprisonment claim against her was not subject to the HCA), while Defendants fail to respond to this argument, the court is not persuaded.  The Supreme Court of Maryland has made clear that a medical injury claim against a non-health care provider is still within the scope of the HCA in the *respondeat superior* context.  *See Grp. Health Ass'n, Inc. v. Blumenthal*, 295 Md. 104, 114 (1983) ("We therefore hold that § 3–2A–02(a) encompasses a claim of malpractice by a health care provider, whether it forms the basis of a suit against that health care provider or a suit against a non-health care provider under the doctrine of *respondeat superior*.").  Maryland law also requires that "claims closely related to a claim subject to arbitration under the HCA should also be filed in the ADR Office to avoid piecemeal litigation."  *Davis v*, 457 Md. at 298.

Where, as here, all of Doe's claims relate to, and arise from, her medical treatment at BWMC, a health care provider under the HCA, and where Defendant McCollum's only apparent authority related to Doe is based on her relationship to BWMC, the court is persuaded that Doe's claim against Defendant McCollum falls within the scope of the HCA.  The claim against Defendant McCollum will therefore also be dismissed, in accordance with the policy underlying the HCA, to avoid piecemeal litigation and because the claim is undeniably related to Doe's claims against all Defendants.[10]

---

[10] The court also notes that Doe's allegations against Defendant McCollum are comparatively minimal—only that Doe's father and a non-profit organization called MindFreedom International telephoned "Defendant McCollum's

Accordingly, the Motion will be granted as to Counts IV and V.

## IV.    CONCLUSION

For the reasons set forth herein, by separate order, the Motion (ECF No. 14) shall be granted.


Date: September 18, 2024                                    /s/_____
                                                           Julie R. Rubin
                                                           United States District Judge

---

office" to demand Doe be released.  (ECF No. 1 ¶ 99.)  Even assuming Defendant McCollum received these demands, which is not clear from the allegation, there is no alleged basis on which a reasonable conclusion could be drawn that Defendant McCollum had authority, as a non-health care provider according to Doe, to make a medical decision to effectuate her release.  Further, Doe asserts in opposition to the Motion that Defendant McCollum "was not involved in providing health care services" to Doe.  (ECF No. 23 at p. 16.)  This bolsters the court's conclusion that the claim against Defendant McCollum is inextricably tied to her claims against Defendant health care providers and should therefore be filed with the ADR Office.